United States Court of Appeals,
Fifth Circuit.

No. 90-8431.

Jane DOE, Plaintiff-Appellee,

v.

TAYLOR INDEPENDENT SCHOOL DISTRICT, et al., Defendants,

Mike Caplinger in his official capacities and Eddy Lankford in his official and individual capacities, Defendants-Appellants.

March 3, 1994.

Appeal from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, GOLDBERG, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

E. GRADY JOLLY and W. EUGENE DAVIS, Circuit Judges:

Jane Doe was sexually molested by her high school teacher in Taylor, Texas. Defendant Eddy Lankford, principal of Taylor High, and defendant Mike Caplinger, superintendent of the Taylor Independent School District, were sued in their supervisory capacity by Jane Doe for permitting violations of her substantive due process right to bodily integrity. The district court denied their claim of qualified immunity, and they have filed this interlocutory appeal on that issue. We hold, first, that schoolchildren do have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment and that physical sexual abuse by a school employee violates that right. Second, we hold that school officials can be held liable for supervisory failures that result in the molestation of a schoolchild if those failures manifest a deliberate indifference to the constitutional rights of that child. Next, we conclude that each of these legal principles was clearly established in 1987, when the violations took place. Finally, in analyzing whether Caplinger and Lankford fulfilled the duty that they owed to Jane Doe, we reverse the district court's denial of immunity to defendant Caplinger, but we affirm its denial of immunity to Lankford.

I

FACTS[1]

Defendant Jesse Lynn Stroud, a twenty-year veteran of Texas's public education system, was employed by the Taylor Independent School District as a biology teacher and assistant coach from 1981 until 1987. It was no secret within the school community that Coach Stroud behaved inappropriately toward a number of young female students over the course of his employment at Taylor High. He made little effort to conceal his fancy for these female students: he wrote notes to them, he let them drive his truck, he exhibited explicit favoritism toward them in class, and often touched them in an overly familiar, inappropriate way.

Defendant Eddy Lankford became the principal of Taylor High in August 1983. By the fall semester of 1985, complaints about Stroud's behavior had reached his office through various channels. During the previous 1984-1985 school year, Stroud had "befriended" one of his female freshman students. Their friendship far transgressed the boundaries of a normal, appropriate teacher-student relationship. Stroud frequently placed candy, flowers, and other gifts in her locker, and the two were often seen exchanging notes. He allowed her to take her friends to lunch in his truck. He wrote excuses for her when she was late for other classes. He often walked her to class, prompting students openly to tease Stroud about his relationship with this girl. Stroud also engaged in overt favoritism in his biology classes. Female students were not required to do classwork or to behave; they often wandered around the classroom, left the classroom during the class period, or changed their grades in Stroud's gradebook. Conversely, male students (with the exception of certain athletes who were coached by Stroud) were made to submit classwork, take tests, and generally behave like regular students.

By the fall of 1985, approximately one year after their "relationship" had begun, rumors about Stroud and the freshman student (by then a sophomore) were circulating not only among students and faculty but also among the town residents of Taylor. Stroud's favoritism in the classroom was

[1]Because this case is on appeal from the denial of a motion for summary judgment, we review the record *de novo.* We are required to review the facts in the light most favorable to the nonmoving party—here, Jane Doe. *See International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). Any disputes of fact are therefore resolved in Jane Doe's favor. *See id.*

also well-known within the school community.  In addition, Stroud had also befriended a *new* female freshman student, and began a similar inappropriate relationship (note-writing, gift-giving, walking to class, etc.) with her.  Principal Lankford approached Stroud outside the fieldhouse during the 1985 football season and spoke to him about being "too friendly" with the sophomore student.

Also during the fall of 1985, the school librarian, Mary Jean Livingood, received telephone calls from two friends whose children were students in Stroud's biology class.  Both mothers complained about Stroud's favoritism toward certain students in the classroom and his use of sexual innuendo in his biology lectures.  Livingood had also seen Stroud engaging in unprofessional conduct; he often grabbed girls around the waist from behind in the hallways or excessively hugged girls while putting his arms around them.  Livingood reported the inappropriate behavior she had witnessed to Principal Lankford and also informed him of the two telephone calls she had received from parents.  Additionally, one of the mothers who had initially called Livingood also called Lankford to complain about Stroud's favoritism in the classroom.  Although Lankford claims that he spoke with Stroud about these complaints, Stroud does not recall any such meeting.

In the spring of 1986, guidance counselor Naomi Pasemann noticed a group of girls gathered around Stroud's desk before school one day;  one of the girls was sitting on top of the desk, while Stroud was seated behind the desk with the rest of the girls around him.  Pasemann told Lankford about this incident;  the two also discussed Stroud's practice of allowing unlicensed freshmen to drive his truck.  Later that spring, the mothers of two female students in Stroud's biology class met with Lankford and complained about Stroud's overt favoritism toward certain girls in the class.  Lankford suggested that their daughters were "a little bit jealous" of those girls in the favored group.

In May of 1986, Livingood reported to Lankford that she had witnessed an episode of "child molestation" involving Stroud and two freshman female students.  Livingood noticed that the lights in the copy room at the library were off;  as she approached the room, she heard loud laughing and talking.  When she looked into the room, she saw Stroud lifting the female students onto a table and catching them as they jumped off of the table into his arms.  She insisted that Stroud stop the behavior.  She immediately reported the incident to Lankford.

Lankford downplayed the incident. He told Livingood that he put his arms around cheerleaders at pep rallies all the time, and joked that he had invented the popular "pro-hugging" bumper stickers often seen on automobiles.[2] Livingood explained that the behavior that she witnessed was of a different ilk, was inappropriate, and was akin to "child molestation." When Stroud later approached Lankford to discuss the incident, the two men agreed that the librarian had overreacted. Lankford did not warn or discipline Stroud—even mildly—for any incident or conduct. Indeed, Lankford failed to document any of the complaints he received about Stroud.

All of this behavior occurred before defendant Mike Caplinger ever moved to Taylor or worked for the Taylor Independent School District. Caplinger became the superintendent of the Taylor ISD in July 1986; Lankford did not inform Caplinger of any problems—real or potential—with Stroud or with his pattern of conduct.

Plaintiff Jane Doe entered Taylor High as a freshman in August 1986; she was a student in Stroud's biology class. Stroud began his seduction of Doe by writing personal—often suggestive—comments on her homework and test papers. The two began exchanging notes and telephoning each other; he often walked her to class. Stroud took Doe and her friends to lunch during the school day and bought alcoholic beverages for them. He did not require Doe to do classwork or to take tests, yet she received high grades in Stroud's class. Not surprisingly, all of this attention flattered Doe, and she developed a "crush" on Stroud.

By late fall, Stroud was touching and kissing Jane Doe. It began with a kiss on her cheek as she was leaving the school fieldhouse one day. Eventually, he began taking her into the laboratory room adjacent to his classroom and to the fieldhouse to engage in kissing and petting. Their physical relationship escalated to heavy petting and undressing in January 1987, when Stroud took Doe and some of her friends, including his own daughter, to a rock concert. There, he bought her alcoholic beverages, took her back to the fieldhouse, and began caressing her in the most intimate of ways. He suggested intercourse, but she refused.

---

[2]The bumper stickers to which Lankford referred are emblazoned with some variation of the slogan "Have you hugged your child (dog, cat, tree, etc.) today?"

Rumors about Doe and Stroud were rampant among the students and faculty by this time. The two were constantly together—walking to class, riding in the car, going out to lunch. Doe often went to Stroud's classroom during other class periods. Coaches and students frequently teased Stroud about his relationship with Doe, often mentioning the two freshman girls he had befriended during the two previous years. Sometime in January 1987, Lankford heard that Stroud had taken Doe and other students to the rock concert; that month he also received complaints from four female students in Stroud's biology class about Stroud's favoritism toward certain students. Lankford spoke with Stroud about this complaint, and, for the first time, notified Caplinger about possible problems with Coach Stroud.

In early February 1987, Mickey Miller, the assistant principal of Taylor's middle school, reported to Caplinger that at a basketball game he had witnessed Stroud behaving inappropriately with several freshman girls, including Jane Doe. Instead of sitting with the team, Stroud was sitting with the girls engaging in horseplay—the girls played with his hair as he halfheartedly "defended" himself. Caplinger instructed Lankford to speak with Stroud about this incident, which he did; the athletic director, Eddy Spiller, also spoke with Stroud about the report. Spiller later told Lankford that he had asked Stroud if Stroud was "fooling around with any of these little old girls," and that Stroud had denied any such behavior. Lankford acknowledges that he did not ask Spiller what prompted him to confront Stroud with this direct question.

On Valentine's Day, Stroud gave Jane Doe a valentine that read: "To my most favorite, prettiest, sweetest, nicest sweetheart in the world! Please don't change cause I need you. I'm in love with you. Forever—for real—I love you." A friend and classmate of Jane Doe's, Brittani B., found the valentine in Doe's purse and took it to Pasemann, the guidance counselor. Brittani told Pasemann about the exchange of notes and gifts between Doe and Stroud, and shared her suspicions that the two were having a sexual relationship. Pasemann told Brittani that she had heard the rumors about Stroud and Doe, and instructed her to take the note to Principal Lankford.

Brittani took the note to Lankford the next day; when she went into his office, he insisted that a witness be present for the meeting to ensure, according to him, "that rumors won't start like those

about Stroud and [Doe]." Lankford examined the note and admitted that the handwriting looked like Stroud's, but told Brittani that he had no proof that it was from Stroud because it was not signed. Lankford told Brittani that Stroud merely had a way of flirting with the girls, and that such behavior was Stroud's "way of doing things." Lankford did not keep a copy of the note and did not investigate the matter further; he did not tell Superintendent Caplinger about the incident, nor did he speak with Stroud or Doe. His only action was to transfer Brittani out of Stroud's biology class.

After a school-sponsored Valentine's Day dance, Jane Doe spent the night at Stroud's home; Doe had befriended Stroud's daughter, and Stroud had invited Doe to spend the night. While Doe was there, Stroud again suggested to her that they have intercourse. Once again, she refused. She spent several nights at the Stroud home over the next few months. In late March or early April 1987, Stroud and Doe had intercourse for the first time. She was fifteen years old. Stroud was her first sexual partner.

Over the next several months, Stroud and Doe had repeated sexual contact. Sex occurred at different locations, both on and off the school grounds. Their romantic relationship—although perhaps not the extent of it—was common knowledge within the Taylor High community, not only among students, but also among the faculty and the parents of many students. Lankford asked a friend whose daughter was a student at the high school to "keep his ears open" for information about Doe and Stroud. On Stroud's performance evaluation by Lankford for the 1986-1987 academic year, however, there was nothing to indicate that Stroud's performance was anything less than fully satisfactory. Indeed, Lankford still had not even informally documented any incident or pattern of conduct relating to Stroud.

In June 1987, Stroud took Doe and some other girls, along with his family, to a local fair, the Corn Festival, where he once again provided them with alcoholic beverages. At least one of the girls became intoxicated. Stroud's wife angrily left the festival when Stroud began dancing with Doe. Stroud and Doe left the festival together, went out to a field, and had sexual intercourse. Later, he and Doe went to his home, where Doe spent the night, and had intercourse again. Two concerned parents, both prominent members of the community, reported to Caplinger that Stroud was behaving

inappropriately with Jane Doe at this festival, that Mrs. Stroud had left the festival because of his behavior, and that there was a possibility that he and Doe had left the festival together. One of the parents also showed Caplinger notes that Stroud had written to his daughter.

In response to the report, Caplinger contacted the parents of the girl who, according to the story, was intoxicated and misbehaving at the festival in the company of Doe and Stroud. When the girl's mother assured him that her daughter had not even been at the festival, that she had been sick and at home, Caplinger dismissed the report as unfounded without investigating further or contacting Jane Doe's parents to discuss the report with them.

Caplinger was by now aware of the rumors about Stroud and Doe and the reports of his favoritism in the classroom. He contacted the school's attorney to discuss the situation concerning Stroud, and, apparently at Caplinger's instruction, Lankford contacted the Texas Education Authority to see if there were any reports about Stroud concerning any inappropriate behavior at the schools where he had previously been employed. Lankford was told that there were no reports specifically naming Stroud, but that the Authority had received an anonymous tip about an inappropriate relationship between a coach and a student at Taylor High.

In July 1987, Doe's parents discovered photographs of Stroud among Doe's possessions with such handwritten inscriptions by Stroud as: "Please don't ever change and don't ever leave me. I want to be this close always—I love you—Coach Lynn Stroud." Doe's parents immediately scheduled a meeting with Caplinger. At the meeting, they showed him the photographs. Caplinger confirmed to them that he was aware of rumors concerning Stroud and Doe and told them about the Corn Festival incident. He promised to convene a meeting of all the parties involved. After speaking with Doe's parents, Caplinger spoke with Jane Doe privately in his office. He showed her the photographs her parents had just presented to him and inquired about the nature of her relationship with Stroud. Doe suggested that the notes on the photos were just "friendly gestures." She explicitly denied any sexual relations with Stroud.

Caplinger called Lankford after the meeting with the Does, who in turn called Stroud. Upon receiving the message, Stroud sought out Lankford; before Lankford had a chance to explain to

Stroud that there had been a meeting with the Does concerning some photographs that he had given to Jane, Stroud vehemently denied any sexual involvement with Doe. For the first time, Lankford spoke of disciplinary consequences. Lankford suggested to Stroud that he resign or take an in-school suspension (which would relieve him of his classroom duties), but Stroud refused. Lankford and Stroud then went over to Caplinger's house at approximately 9:30 p.m. that evening. Caplinger, who had guests in his house, left his house and went to his office accompanied by Lankford and Stroud. There, the three men discussed the situation. Caplinger and Lankford warned Stroud to keep his distance from Jane Doe, and that he would be fired "if something was going on." No further action was taken, however; the meeting that Caplinger had promised to schedule never took place, and Stroud did not hear from either Lankford or Caplinger again until October 6, the day he was suspended from employment.

Although Jane Doe was able to stay away from Stroud for the remainder of the summer vacation, when classes resumed in the late summer of 1987, Stroud's sexual advances towards her resumed as well, and soon thereafter they began having intercourse again. Lankford admits that he watched Stroud no more closely than he previously had. The sexual contact continued into the fall of Jane Doe's sophomore year, until October 5, when Doe's mother found more love letters from Stroud among Jane's possessions. The Does then consulted their family lawyer, who agreed to discuss the matter with Jane. Upon meeting with Jane, the attorney learned the truth about her sexual involvement with Stroud. Doe explained that she had kept the matter a secret because she feared the repercussions of disclosure.

The attorney reported the information to Caplinger at once. Coincidentally, on the same day, the mother of another female student contacted the administration to report that her daughter had also been victimized by Stroud; Stroud had grabbed the student's buttocks in class that day. Caplinger ordered Stroud immediately suspended from employment. Stroud later resigned his position and pled guilty to criminal charges stemming from his molestation of Jane Doe.

II

PROCEDURAL HISTORY

Jane Doe brought this § 1983 civil rights lawsuit against Stroud, the school district, Superintendent Caplinger, and Principal Lankford. She charged *inter alia* that these defendants, while acting under color of state law, deprived her of her constitutional rights guaranteed by the Fourteenth Amendment's Due Process and Equal Protection Clauses, in violation of 42 U.S.C. § 1983. Following the denial of their motions for summary judgment on qualified immunity grounds, Caplinger and Lankford filed this appeal. Both contend that they are entitled to qualified immunity because: (1) Jane Doe was not deprived of any constitutional right when she was sexually molested by Coach Stroud; (2) even if Doe was deprived of a constitutional right, they owed her no duty in connection with this constitutional violation; (3) even if Doe was deprived of a constitutional right and they owed her a duty with respect to that right, these issues of law were not "clearly established" in 1987 when the violations took place; and (4) in any event, their response to the situation satisfied any duty that they owed to Doe.

III

DUE PROCESS

A

The first step in deciding whether Caplinger and Lankford are entitled to claim qualified immunity from this lawsuit is to determine whether the Constitution, through the Fourteenth Amendment's substantive due process component, protects school-age children attending public schools from sexual abuse inflicted by a school employee. "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433, 443 (1979). To state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs "must show that they have asserted a recognized "liberty or property' interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Griffith v. Johnston,* 899 F.2d 1427, 1435 (5th Cir.1990) (citations omitted), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). "The Supreme Court has expanded the definition of "liberty' beyond the core textual meaning of that term to include [not

only] the ... privileges [expressly] enumerated by the Bill of Rights, [but also] the "fundamental rights implicit in the concept of ordered liberty' and "deeply rooted in this Nation's history and tradition' under the Due Process Clause." *Id.; see also Bowers v. Hardwick,* 478 U.S. 186, 191, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140, 146 (1986); *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 869, 74 L.Ed.2d 675, 684-85 (1983); *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531, 539-40 (1977).

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive a person of life, liberty or property without due process of law." The Supreme Court has noted: "Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years, at least since *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 [in 1887], the Clause has been understood to contain a substantive component as well...." *Planned Parenthood v. Casey,* --- U.S. ----, ----, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674, 695 (1992) (citation omitted). This substantive component of the Due Process Clause "protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights,* --- U.S. ----, ----, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 273 (1992) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668 (1986)).

Jane Doe's substantive due process claim is grounded upon the premise that schoolchildren have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment and upon the premise that physical sexual abuse by a school employee violates that right. This circuit held as early as 1981 that "[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process." *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981). *Shillingford* involved a § 1983 action by a tourist against a New Orleans police officer. Shillingford was attending Mardi Gras festivities in New Orleans when he attempted to take a photograph of the officer making an arrest. The officer was annoyed and struck Shillingford with his nightstick, inflicting some physical injury. We found such action sufficient "to transcend the bounds of ordinary tort law and establish a

deprivation of constitutional rights." *Id.* at 266.

We cited *Shillingford* for this principle of law in *Jefferson v. Ysleta Independent School District,* 817 F.2d 303, 305 (5th Cir.1987), a case involving a violation of a schoolchild's substantive due process rights by a teacher. The teacher in *Jefferson* lashed a second grade student to a chair for the better part of two school days. Again, we found that such actions by the teacher violated the student's substantive due process " "right to be free of state-occasioned damage to [her] bodily integrity.' " *Id.* (quoting *Shillingford,* 634 F.2d at 265). We have also held that the infliction of "corporal punishment in public schools "is a deprivation of substantive due process when it is arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning.' " *Fee v. Herndon,* 900 F.2d 804, 808 (5th Cir.) (quoting *Woodard v. Los Fresnos Indep. Sch. Dist.,* 732 F.2d 1243, 1246 (5th Cir.1984)), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990).

If the Constitution protects a schoolchild against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a schoolchild from physical sexual abuse—here, sexually fondling a 15-year old school girl and statutory rape—by a public schoolteacher. Stroud's sexual abuse of Jane Doe, earlier detailed in this opinion, is not contested by the defendants. Thus, Jane Doe clearly was deprived of a liberty interest recognized under the substantive due process component of the Fourteenth Amendment.[3] It is incontrovertible that bodily integrity is necessarily

---

[3]Although the appellants seem to argue that in its opinion in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 198-200, 109 S.Ct. 998, 1005-06, 103 L.Ed.2d 249, 260-62 (1989), the Supreme Court overruled the portion of *Jefferson* declaring the existence of such a substantive due process right, such a view is a serious misreading of *DeShaney's.* In *DeShaney,* a child was rendered comatose by injuries inflicted by his own father, a *private* (as opposed to state) actor. The plaintiffs argued that because the state had notice of the possibility of abuse of the child, and in fact had intervened in the relationship (obviously ineffectively) before the final episode of abuse, it deprived the child of his right to protection afforded by substantive due process. The Court categorically rejected this argument on the ground that nothing in the Due Process Clause requires the state to protect its citizens' liberty interests against invasions by private actors.

The Court then went on to address the plaintiffs' alternative argument, and it is this portion of the opinion from which the appellants seek support for their position that they owed no constitutional duty to Jane Doe. The *DeShaney* plaintiffs argued that even if the Due Process Clause does not protect citizens from injuries by private actors (which actually assumes that no violation of a constitutional right even occurred), an affirmative

violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment.[4] Obviously, there is never any justification for sexually molesting a schoolchild, and thus, no state interest, analogous to the punitive and disciplinary

duty on the part of the state may nonetheless arise out of "special relationships" created between the state and particular individuals, *i.e.,* that the state had a duty to protect particular individuals in its charge. It is in this context—addressing an argument advocating a derivative constitutionally-based duty on the part of the state to protect citizens from harm by private actors if those citizens stand in a "special relationship" to the state—that the Court suggested that state officials' duty to protect citizens under the Due Process Clause was limited to those persons whose freedom has been affirmatively restrained by the state.

The appellants seem to argue that because schoolchildren cannot be said to be affirmatively restrained by the state merely because they are compelled to attend school, no "special relationship" arises between the schoolchild and the state, and thus the child possesses no substantive due process rights in his status as a public school student. The cited remarks from the *DeShaney* court simply do not address the issues involved in this case. First, *DeShaney* does not suggest that individuals, whether "under the state's care" or not, have no due process rights against an offending state actor. Consequently, *DeShaney* does not in the slightest diminish the constitutional due process rights belonging to Jane Doe against Lynn Stroud. Second, *DeShaney* is possibly relevant to the constitutional duty imposed on Caplinger and Lankford, but only if an affirmative duty to protect students from constitutional violations is placed on them, a duty which even Jane Doe disavows.

[4]Lankford and Caplinger argue first that Stroud's actions were not taken under color of state law. They rely on *D.T. by M.T. v. Independent School District No. 16,* 894 F.2d 1176 (10th Cir.1990), in which a teacher molested three students during the summer while engaged in a fundraising campaign for a basketball camp. The school made it clear to the teacher that the fundraising activity was not a school program but rather was organized as a community volunteer effort. In this case, however, Stroud took full advantage of his position as Doe's teacher and coach to seduce her. He required Doe to do little or no work in the classroom and still gave her A's. He also spoke to one of Doe's other teachers about raising her grade in that class. Stroud was also Doe's basketball coach and he exploited that position as well. The first physical contact Stroud had with Doe was after a basketball game in November 1986 when he grabbed her and kissed her. Stroud's physical contact with Doe escalated thereafter. During the next several months Stroud took Doe from his classroom to an adjoining lab room where he kissed and petted her. During that same period of time Stroud also met Doe in the school's fieldhouse where similar activity took place.

As the court in *D.T.* recognized, if a "real nexus" exists between the activity out of which the violation occurs and the teacher's duties and obligations as a teacher, then the teacher's conduct is taken under color of state law. *Id.* at 1188. As demonstrated by the above facts, the nexus that was missing in *D.T.* was clearly present in this case. We therefore reject the school officials' argument that Stroud's acts were not under color of state law.

objectives attendant to corporal punishment, which might support it.[5]

B

Having concluded that Stroud's physical sexual abuse of Jane Doe violated her constitutional right to substantive due process, we next must decide whether school officials, like the appellants in this case, owe any duty to a schoolchild when a subordinate violates that child's constitutional rights. Section 1983 provides a claim against anyone who, "under color of" state law, deprives another of his or her constitutional rights. 42 U.S.C. § 1983; *see, e.g., Collins v. City of Harker Heights,* --- U.S. ----, ----, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261, 270 (1992).

In *Monell v. New York City Department of Social Services,* 436 U.S. 658, 691-94, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611, 635-38 (1978), the Supreme Court held that Congress intended § 1983 to apply to local government entities as well as to persons. The Court, however, also held that local governments cannot be held liable under § 1983 on a *respondeat superior* theory. Similarly, we have held that supervisory officials may not be found vicariously liable for the actions of their subordinates under § 1983.[6] *Lopez v. Houston Indep. Sch. Dist.,* 817 F.2d 351, 355 (5th Cir.1987) (citing *Thibodeaux v. Arceneaux,* 768 F.2d 737, 739 (5th Cir.1985)).

This circuit has held that supervisors can be liable for "gross negligence" or "deliberate indifference" to violations of their subordinates. In *Hinshaw v. Doffer,* 785 F.2d 1260, 1262 (5th Cir.1986), Hinshaw sued both the police chief and his deputy for the deputy's excessive use of force in arresting Hinshaw, who had come to the police station to investigate a report that the police had arrested and roughed up his son. We established a three-part test for supervisory liability in which,

---

[5]Thus, those cases in this circuit that have held that the infliction of excessive corporal punishment does not violate due process are inapposite. *See, e.g., Fee v. Herndon,* 900 F.2d 804 (5th Cir.), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990).

[6]The dissent argues that the Supreme Court in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), determined that a supervisor could not be liable for a mere failure to act; a supervisor must have engaged in affirmative conduct in order to be held liable. We do not read *Rizzo* so broadly and neither does the Supreme Court. In *Monell,* 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58, 56 L.Ed.2d at 637 n. 58, the Court read *Rizzo* as having decided "that the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Rizzo* therefore does not preclude liability for a supervisor who in fact controls a subordinate or who fails to supervise a subordinate.

"the plaintiff must show that:  1) the police chief failed to supervise or train the officer, 2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights, and 3) such failure to supervise or train amounted to gross negligence or deliberate indifference." *Id.* at 1263.

In *Lopez,* we applied these same principles when we adopted a narrow duty on the part of school officials:  a duty not to "callously disregard" a student's constitutional rights. *Id.* 817 F.2d at 355.  The *Lopez* panel, throughout its opinion, interchangeably used the terms "callous disregard," "deliberately indifferent," "grossly negligent," and "callous indifference."  In addition, in a case involving a municipality's alleged failure to train its employees, the Supreme Court rejected the gross negligence standard of liability in favor of the stricter[7] deliberate indifference standard.  *City of Canton v. Harris,* 489 U.S. 378, 381, 388, 109 S.Ct. 1197, 1200-01, 1204, 103 L.Ed.2d 412, 421-22, 426 (1989).  The Court's reasoning in assessing a municipality's liability leads us to use the same standard in assessing an individual supervisor's liability under § 1983.

In *Canton,* the Supreme Court held that a municipality is responsible in certain circumstances under § 1983 for a failure to train its employees that results in the violation of a plaintiff's right to receive necessary medical attention while in police custody. *Id.*  The Court explained, however, that such liability, predicated on a violation of the plaintiff's right under the Due Process Clause of the Fourteenth Amendment, depends on a showing of (1) a "deliberately indifferent" policy of training that (2) was the "closely related" cause of the violation of the plaintiff's federally protected rights. Id. at 388, 391, 109 S.Ct. at 1204, 1206, 103 L.Ed.2d at 426, 428.  The Court explained that "to adopt lesser standards of fault and causation" would result in *de facto respondeat superior* liability for municipalities:

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done' to prevent the unfortunate incident.  Thus, permitting cases against cities for their

[7]Although these terms are sometimes used interchangeably, "gross negligence" and "deliberate indifference" involve different degrees of certainty, on the part of an actor, that negative consequences will result from his act or omission.  Whereas the former is a "heightened degree of negligence," the latter is a "lesser form of intent." *Germany v. Vance,* 868 F.2d 9, 18 n. 10 (1st Cir.1989).

"failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities—a result we rejected in *Monell.*

*Id.* at 392, 109 S.Ct. at 1206, 103 L.Ed.2d at 428 (citation omitted). The Court further explained that lesser standards of fault and causation would require the federal courts endlessly to "second-guess" the wisdom of municipal training programs, a task inappropriate for the federal judiciary. *Id.* One commentator has suggested a third reason for the Court's holding: "[O]nly when training deficiencies are the result of deliberate indifference will the trier of fact be able to conclude that inadequate training was the actual or "closely related' cause of the violation of the plaintiff's federal rights." Martin A. Schwartz & John E. Kirklin, 1 *Section 1983 Litigation: Claims, Defenses, and Fees* § 7.9, at 372 (2d ed. 1991).

The most important difference between City of *Canton* and this case is that the former dealt with a municipality's liability whereas the latter deals with an individual supervisor's liability. The legal elements of an individual's supervisory liability and a political subdivision's liability, however, are similar enough that the same standards of fault and causation should govern. A municipality, with its broad obligation to supervise all of its employees, is liable under § 1983 if it supervises its employees in a manner that manifests deliberate indifference to the constitutional rights of citizens. We see no principled reason why an individual to whom the municipality has delegated responsibility to directly supervise the employee should not be held liable under the same standard. Other circuits have reached substantially the same result. *See Sample v. Diecks,* 885 F.2d 1099, 1117-18 (3d Cir.1989) ("Although the issue here is one of individual liability rather than of the liability of a political subdivision, we are confident that, absent official immunity, the standard of individual liability for supervisory public officials will be found to be no less stringent than the standard of liability for the public entities that they serve." (footnote omitted)); *Greason v. Kemp,* 891 F.2d 829, 837 (11th Cir.1990); *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 725 (3d Cir.1989) (*Stoneking II* ), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); *Jane Doe "A" v. Special Sch. Dist.,* 901 F.2d 642 (8th Cir.1990).

There are other differences between *Canton* and this case. For example, *City of Canton*

involved a different kind of supervisory liability, failure to train, from that involved here. Moreover, the plaintiff in *City of Canton* alleged a violation of her substantive due process right to receive medical attention whereas the plaintiff in this case alleges a violation of her substantive due process right to be free from sexual abuse. The similarities between the cases, however, are more important than the differences: Both cases involve alleged failures of supervisors to prevent substantive due process violations occasioned by their subordinates.[8] Thus, in *Gonzalez v. Ysleta Independent School District,* 996 F.2d 745, 753-60 (5th Cir.1993), we applied *City of Canton* to an elementary school student's § 1983 claim against a school district for supervisory failures that led to a teacher's violation of her substantive due process right to bodily security.[9] We concluded that the school district could be held liable for supervisory failures resulting in the molestation of the student only if those failures "manifested a deliberate indifference to the welfare of the school children." *Id.* 996 F.2d at 760. We therefore hold that a school official's liability arises only at the point when the student shows that the official, by action or inaction, demonstrates a deliberate indifference to his or her constitutional rights.

Using this standard, we adopt the following test, which determines the personal liability of school officials in physical sexual abuse cases. A supervisory school official can be held personally liable for a subordinate's violation of an elementary or secondary school student's constitutional right to bodily integrity in physical sexual abuse cases if the plaintiff establishes that:

(1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and

(2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and

---

[8]Even if the underlying constitutional violation were different from that involved in City of *Canton,* the deliberate indifference standard for liability would apply. As the Supreme Court explained, this standard of liability derives from the language of § 1983, which provides a remedy against anyone who, under color of state law, "causes" another to be subjected to a violation of his or her constitutional rights. City of *Canton,* 489 U.S. at 388 n. 8, 109 S.Ct. at 1204 n. 8, 103 L.Ed.2d at 426 n. 8. In contrast, the standard of liability in a case against the actual perpetrator of a constitutional violation derives from the particular constitutional provision at issue, not from § 1983. *Daniels v. Williams,* 474 U.S. 327, 329-30, 106 S.Ct. 662, 664, 88 L.Ed.2d 662, 667 (1986); *Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 759 (5th Cir.1993).

[9]The school district conceded that the elementary school teacher's molestation of one of his students violated her "constitutional right to personal security." *Gonzalez,* 996 F.2d at 750 n. 6.

(3) such failure caused a constitutional injury to the student.

C

We must next consider these legal principles in the context of qualified immunity. Under the shield of qualified immunity, Caplinger and Lankford cannot be held liable under § 1983 unless (1) Jane Doe's liberty interest under the substantive due process component of the Fourteenth Amendment, and (2) Caplinger's and Lankford's duty with respect to Jane Doe's constitutional right were "clearly established" at the time these events took place. *See Stem v. Ahearn,* 908 F.2d 1, 5 (5th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987). The term "clearly established" does not necessarily refer to "commanding precedent" that is "factually on all-fours with the case at bar," or that holds the "very action in question" unlawful. *Jefferson,* 817 F.2d at 305 (footnote omitted); *Anderson,* 483 U.S. at 640, 107 S.Ct. 3039, 97 L.Ed.2d at 531. Rather, a constitutional right is clearly established if "in the light of pre-existing law the unlawfulness [is] apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531. Put another way, officials must observe "general, well-developed legal principles." *Jefferson,* 817 F.2d at 305.

Lankford and Caplinger argue, first, that the underlying constitutional right, to be free of sexual abuse, was not clearly established in 1987. Second, they assert that even if the underlying constitutional right was clearly established in 1987, their duty under § 1983 not to be deliberately indifferent to a subordinate's violation of that right was not clearly established.

The "contours" of a student's substantive due process right to be free from sexual abuse and violations of her bodily integrity were clearly established in 1987. In 1987 this court held that it was clearly established in 1985 that the Due Process Clause protects a schoolchild from being lashed to a chair for the better part of two days for "instructional purposes." *Jefferson,* 817 F.2d at 305. As the panel in this case noted, Judge Posner has observed:

> There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from

damages liability....

*K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990). This case involves similarly egregious and outrageous conduct. Indeed, this much seems crystal clear: No reasonable public school official in 1987 would have assumed that he could, with constitutional immunity, sexually molest a minor student.[10]

Not only was the underlying violation clearly established in 1987, but Lankford's and Caplinger's duty with respect to that violation was also clearly established at that time. In *Lopez,* a student who was knocked unconscious during a fight on a school bus sued the bus driver's supervisors under § 1983, alleging that the supervisors' failure to properly train the driver resulted in the driver's failure to break up the melee and render medical assistance. 817 F.2d at 353, 355. In that case, we held that the supervisors could be found liable if they "callously disregarded," or were "grossly negligent" to, the student's right to bodily integrity and if their failure to train resulted in the violation of that right. *Id.* at 355. Our cases before *Lopez,* although arising under somewhat different circumstances, also acknowledged a duty on the part of supervisors not to be grossly negligent or deliberately indifferent to constitutional violations perpetrated by their subordinates. For example, in *Wanger v. Bonner,* 621 F.2d 675 (5th Cir.1980), we upheld a trial court's instruction that a sheriff could be liable for his deputies' activities even though he did not participate in them, "if you find that he failed to adequately supervise or train his deputies, thus causing a violation of plaintiffs' civil

---

[10]The appellants' citation to *Spann v. Tyler Independent School District,* 876 F.2d 437, 438 (5th Cir.1989), *cert. denied,* 493 U.S. 1047, 110 S.Ct. 847, 107 L.Ed.2d 841 (1990), is unavailing. The fact that we "assume" a duty for purposes of writing an opinion, as we did in *Spann,* does not support a conclusion that no duty existed.

Citing *Matherne v. Wilson,* 851 F.2d 752, 759 (5th Cir.1988), Lankford and Caplinger also argue that when a right must be reexamined in the light of new precedent, it is not "clearly established" within the meaning of *Anderson.* Thus, they attempt to find significance in the fact that the Supreme Court vacated and remanded another sexual abuse case, *Stoneking v. Bradford Area School District,* 856 F.2d 594 (3d Cir.1988) (*Stoneking I* ), with instructions to reconsider the school administrator's claims of qualified immunity in the light of the *DeShaney* opinion. *See Smith v. Stoneking,* 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). *Matherne,* however, is distinguishable because it involved a question of whether a public employee could engage in political activity, an issue that requires a difficult balancing of interests and has resulted in conflicting case law. *Matherne,* 851 F.2d at 756-59.

rights." *Id.* at 680. In *Bowen v. Watkins,* 669 F.2d 979, 988 (5th Cir.1982), we observed generally that:

> Although supervisory officials cannot be held liable solely on the basis of their employer-employee relationship with a tortfeasor, they may be liable when their own action or inaction, including a failure to supervise that amounts to gross negligence or deliberate indifference, is a proximate cause of the constitutional violation.

We also held that a municipality's supervisory liability for a police officer's violation of a citizen's constitutional rights depended on a showing that, among other things, the municipality displayed "gross negligence amounting to conscious indifference." *Languirand v. Hayden,* 717 F.2d 220, 227 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984); *see also Hinshaw v. Doffer,* 785 F.2d 1260 (5th Cir.1986).

In the face of this precedent, Lankford and Caplinger point to no authority from this circuit involving school officials which would enable them to reasonably believe, in 1987, that they could be deliberately indifferent to their subordinate's violation of a student's constitutional rights and escape supervisory liability under § 1983. In fact, *Lopez* and our earlier cases arguably announced a broader duty on the part of school officials than we adopt today. *See Lopez,* 817 F.2d at 355. By narrowing the duty that § 1983 imposes on supervisors, the courts have not affected its status as "clearly established."

D

Having established that Jane Doe's constitutional right to bodily integrity and the appellants' duty with respect to that right were clearly established in 1987 when these events occurred, we must determine whether, on the record before us, Lankford and Caplinger have established that they satisfied their duty to Doe, and are thus entitled to summary judgment as a matter of law.[11]

The plaintiff in this case has adduced clear summary judgment evidence of deliberate

---

[11]Because this case is on appeal from the denial of a motion for summary judgment, we review the record *de novo.* We are required to review the facts in the light most favorable to the nonmoving party—here, Jane Doe. *See International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). Any disputes of fact are therefore resolved in Jane Doe's favor. *See id.*

indifference by defendant Lankford toward her constitutional rights.[12]  By 1987, Lankford had certainly received notice of a pattern of inappropriate behavior that had been committed by Stroud that suggested misconduct of a sexual nature.  He had spoken with Stroud two years earlier, in 1985, about being "too friendly" with a particular female student.  He had received complaints from parents about Stroud's favoritism toward certain girls in the classroom.  The school librarian reported Stroud's inappropriate behavior with female students to Lankford on two occasions, and at one point described the incident she witnessed as "child molestation."  More importantly, Lankford received knowledge that Stroud was directing his inappropriate sexual behavior specifically toward Doe.  He had heard about Mickey Miller's report of Stroud's misconduct with freshman girls, including Jane Doe, at a school basketball game.  A jury could find that Lankford then received a clear signal that Stroud and Doe were engaged in a sexual relationship when Brittani B. gave him the valentine in February 1987.  Later that year, Lankford received reports about Stroud's inappropriate behavior with Doe at the Corn Festival and learned that Doe's parents had discovered Stroud's autographed photographs in Doe's possession.  Thus, under the facts construed in the light most favorable to Jane Doe and considering all the information Lankford received about Stroud's relationship with Doe, she has satisfied the first prong of the test with respect to defendant Lankford—knowledge of facts or a pattern of inappropriate sexual behavior by Stroud pointing plainly toward the conclusion that he was

---

[12]Deliberate indifference will often be a fact-laden question—as it is in this case—and, consequently, it is impossible for us to draw bright lines in such an inquiry.  We can foresee many good faith but ineffective responses that might satisfy a school official's obligation in these situations, *e.g.,* warning the state actor, notifying the student's parents, or removing the student from the teacher's class.  Indeed, if Lankford had sternly warned Stroud early on to stay away from Doe or risk termination and Lankford then received no later indication of further misconduct, the standard of deliberate indifference would be difficult to establish.

It has been suggested that our opinion today might force a school official to subject himself to liability by acting on incomplete information.  This misinterpretation should be corrected.  Surely an official does not expose himself to liability by reporting the information to a superior;  or by advising a subordinate state actor of rumors or information that the official has received and warning the actor that severe disciplinary action will be taken if the rumors are confirmed;  or if plausible information of misconduct continues to come to his attention to investigate such information;  or if disputes arise as to the reliability of that information, to hold a hearing—closed door, if justified—to resolve such disputes.  In short, there are many courses of action open to a school official that negate deliberate indifference but do not expose the official to liability on grounds of taking premature disciplinary action against a state actor.

sexually abusing Doe.

Doe has also illustrated, in a manner sufficient to survive a summary judgment motion, that Lankford demonstrated deliberate indifference to the offensive acts by failing to take action that was obviously necessary to prevent or stop Stroud's abuse. When certain parents complained about Stroud's favoritism, Lankford suggested that their children were "jealous" of the favorite students. Lankford similarly dismissed the librarian's report of "child molestation." In perhaps the most striking example of his apathy, he responded to Brittani B.'s presentation of the valentine—which he admitted appeared to bear Stroud's handwriting—by transferring *Brittani* (not Jane Doe) out of Stroud's class. He never bothered to discuss the valentine incident with Caplinger, Stroud, Doe, or Doe's parents. He did not record any of these complaints of inappropriate conduct in Stroud's personnel file. He did not take the obvious steps of removing Doe from Stroud's class and directing Stroud to stay away from Doe. Both Stroud and Doe stated that they did not begin having sexual intercourse until late March or early April 1987. A jury could reasonably conclude that had Lankford taken actions that were obviously necessary in response to the valentine—indeed, if he had responded at all—the relationship might have been derailed at that point and the violation of Jane Doe's rights would not have been as severe or prolonged. Thus, Jane Doe has, in a manner sufficient to withstand a motion for summary judgment, stated a claim under § 1983 that defendant Lankford was deliberately indifferent to his subordinate's violation of her constitutional right to bodily integrity.[13]

With respect to whether defendant Caplinger is immune from this lawsuit, however, the evidence presented tells a different story. The first time Caplinger heard of any potential misconduct by Stroud was when he received the report from Mickey Miller in February 1987. He promptly notified Lankford and instructed him to speak with Stroud about the incident. There is no evidence that Lankford informed Caplinger at that time about Stroud's past behavior, and it is undisputed that

---

[13]Lankford argues that his conduct, as a matter of law, could not have manifested deliberate indifference to the violation of Doe's constitutional rights because he met with Stroud two times in response to complaints about Stroud's activities. These facts, however, are subject to varying interpretations. A jury could conclude, for example, that one meeting never took place, because Stroud had no memory of it; similarly, a jury might conclude that the other meeting resulted not from Lankford's initiative, but because of Caplinger's involvement. Although Lankford is certainly free to make these arguments at trial, they are unavailing at the stage of summary judgment.

Lankford never documented any of the reports he had received about Stroud.

Caplinger did not receive any other reports about Stroud until June 1987, when two parents reported the Corn Festival incident to him. Again, Caplinger promptly responded by contacting the parents of one of the allegedly misbehaving students reportedly at the festival. He was assured that the accused student was not even at the event. We cannot say that Caplinger's decision not to pursue the investigation further, after the parents assured him that their child had not even attended the Corn Festival, exhibited deliberate indifference.

When Doe's parents met with Caplinger concerning the photographs of Stroud in July 1987, Caplinger again responded appropriately, if ineffectively, to the situation. He met with Jane Doe privately and questioned her about her relationship with Stroud. He also met with Stroud, verbally reprimanded him about the inappropriate comments on the photographs, warned him to keep his distance from Jane Doe, and informed him of the consequences if the misconduct continued.

Although after the July photograph incident Caplinger had received notice of a pattern of inappropriate sexual behavior sufficient to satisfy the first prong of the test, he certainly did not respond to the misconduct with deliberate indifference. He instructed Lankford to speak with Stroud about the incident at the basketball game; he personally investigated the report concerning the Corn Festival report; and he met with Stroud immediately after learning of the photographs, reprimanded him for his conduct, and unequivocally warned him of the consequences if any further misconduct was reported. His actions were ineffective, but not deliberately indifferent. Summary judgment should have been granted to defendant Caplinger on the grounds of qualified immunity.

IV

EQUAL PROTECTION

The plaintiff also asserts that Stroud's behavior toward her violated her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment. Doe advances three separate equal protection theories, based on two different sorts of behavior. She first argues that the physical sexual abuse to which Stroud subjected her constituted sexual harassment, which she argues is offensive to the Equal Protection Clause. Second, she contends that Stroud's classroom favoritism toward her

also constituted sexual harassment. Finally, she argues that the classroom favoritism constituted the more typical form of disparate gender discrimination, which the Supreme Court has found to be prohibited by the Equal Protection Clause. Following these theories, Doe argues that Caplinger and Lankford should be liable because, as in the case of her due process claim, they were deliberately indifferent to the unconstitutional conduct that caused her injury.

Assuming that Stroud sexually abused Doe, which the defendants do not contest, Stroud violated Doe's substantive due process rights as a matter of law. Doe does not claim that the damages that she could recover from Lankford based on Stroud's alleged violation of her equal protection rights would be any more extensive than the damages that she could recover based on the substantive due process violation. Nor does she argue that, or show how, Caplinger could be supervisorily liable for equal protection violations predicated on Stroud's sexual abuse when he is not supervisorily liable for substantive due process violations involving the same conduct. Consequently, we need not reach the question of whether Doe states an equal protection claim.

V

The sole question before us is the propriety of the district court's denial of qualified immunity to the appellant school officials. The school officials' main argument that the liability of a school official for ignoring a subordinate's sexual abuse of a 15-year old student was not clearly established in 1987.

Appellants, however, agree that by 1987 the Constitution clearly protected the most hardened criminal inmate from abuse by his guard and imposed liability on the guard's supervisor who was consciously indifferent to such abuse. Similarly, appellants cannot seriously contest that the § 1983 liability of a police chief was not clearly established in 1987 when the chief was consciously indifferent to his officer's physical abuse of a citizen. In short, supervisory liability for deliberate indifference to constitutional violations committed by subordinates was clearly established when the events in this case occurred. Consequently, the school officials' argument that with constitutional immunity they could ignore the teacher/coach's physical sexual abuse of an impressionable 15-year old student is, as a practical matter perverse, and, as a legal matter, not supported by the case law. Such an

argument neither legally nor logically makes any sense.

For the reasons stated above, we affirm the district court's order denying qualified immunity to defendant Lankford and reverse the district court's order denying qualified immunity to defendant Caplinger. We also remand this case to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part and REMANDED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, with whom POLITZ, Chief Judge, joins specially concurring:

The complex and interrelated roles played by state and federal law in Fourteenth Amendment jurisprudence require subtle, often Byzantine, analysis. True to form, the legal basis of this case is complex. Not so true to form, the judgment it demands is simple. This is a case about power and its abuse. The state conferred the power and Stroud abused it. That Coach Stroud exceeded the constitutional limits of his authority, and that Principal Lankford caused a violation of Doe's rights by looking away, are truths too plain to admit of uncertainty, legal or otherwise. We have never understood the Fourteenth Amendment to permit such a misuse of state power. I therefore join the majority opinion.

The majority and dissents divide today over the "law," but that division rests largely on different perceptions of the human condition. We have all looked at the same set of facts and come away with quite different perceptions of what transpired between teacher and pupil. The majority sees an exploitation of power and the dissents see causal sex. Make no mistake about it. This case is not about a high school coach who happened to have an affair with a student. It is about abuse of power.

Our dissenting colleagues lodge carefully drafted and cogent objections, although I remain persuaded that the majority has it "right." With no burden to stitch together an agreement of a majority, a burden well-carried by Judges Jolly and Davis, I am free to engage the dissents by writing separately and to add a gloss to the majority's reasoning.

## I.

In *Bush v. Viterna,* 795 F.2d 1203 (5th Cir.1986), we set out three steps necessary to drawing

the circle of liability under 42 U.S.C. § 1983. As we noted, section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, *or causes to be subjected,* any ... person within the jurisdiction [of the United States] to the deprivation of any rights ... secured by the Constitution and laws, shall be liable to the party injured...." *Viterna,* 795 F.2d at 1204 (citing 42 U.S.C. § 1983) (emphasis and alterations in original). We have interpreted section 1983 to require a court to determine whether a rights violation occurred, whether it occurred under color of state law, and whether the particular state actor or actors before the court caused the violation. *Id.* at 1209.

## A

I first ask whether Doe's rights were violated. *Id.* I conclude with the majority that they were. The majority and Judge Garwood's dissent agree today that the Due Process Clause of the Fourteenth Amendment affords Doe a liberty interest in her bodily integrity, protected from certain unwarranted state deprivations. *See Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981). This protection extends to a student's right to be free from corporal punishment in school if arbitrary, capricious, or wholly unrelated to a legitimate state purpose. *Fee v. Herndon,* 900 F.2d 804, 808 (5th Cir.), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990) (citations omitted). The right also protects a fifteen-year-old student from a teacher who uses his authority to sordid sexual ends. *See Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 750 (5th Cir.1993) (acknowledging student's right to be free from sexual abuse by teacher). *See also Jefferson v. Ysleta Indep. Sch. Dist.,* 817 F.2d 303, 305 (5th Cir.1987) (recognizing student's "right to be free of state-occasioned damage to [the student's] bodily integrity") (citation and internal quotation marks omitted).

Judge Jones argues that a child has no constitutionally protected interest in being free from physical sexual abuse by a teacher who uses his position of authority to seduce her. I respectfully disagree with that result and the methodology behind it. She quotes but does not apply the Supreme Court's pronouncement in *Michael H.* that, "the term "liberty' in the Due Process Clause extends beyond freedom from physical restraint." *Michael H. v. Gerald D.,* 491 U.S. 110, 121, 109 S.Ct. 2333, 2340, 105 L.Ed.2d 91 (1989) (citing *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571,

69 L.Ed. 1070 (1925) and *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)).

We have held that a student has a right to be free from corporal punishment inflicted in a way that

is "arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere

conducive to learning." *Woodard v. Los Fresnos Indep. Sch. Dist.,* 732 F.2d 1243, 1246 (5th

Cir.1984). The physical sexual abuse here was, then, *a fortiori* a deprivation of Doe's liberty

interests. I do not see how Coach Stroud's use of his position of authority to pressure and manipulate

Doe into sex could be other than arbitrary and capricious. It served no legitimate state goal. Judge

Jones at times appears to recognize our long history of using state and federal law to determine the

traditions and conscience of our people.[1] She is correct to do so. The deeper the mark of

disapproval that state and federal civil and criminal law have placed on Stroud's acts, the stronger the

case that Doe's liberty interest is fundamental. *See Michael H.,* 491 U.S. at 122, 109 S.Ct. at 2341.

Whether a foundation in state and federal laws and their history is either necessary or sufficient for

the recognition of a right may be contested. That such a foundation supports recognition of a right

is uncontroversial.[2]

Nevertheless, Judge Jones rests her claim that the Constitution does not afford Doe protection

in part on the fact that state and federal laws provide Doe a remedy for her complaints. Judge Jones

---

[1]*See* Jones Dissent slip op. at 2899 n. 4 (concurring in Judge Garwood's dissent); *id.* slip op. at 2902 n. 8 ("Although all of the states maintain criminal laws against statutory rape, not all of them set the age of consent at the age of fifteen. In some of the states, the age of consent is lower. This poses an interesting question: has the majority made a constitutional offense of conduct that in some states is not criminal?") (citation omitted).

[2]Compare footnote 6 of Justice Scalia's opinion in *Michael H.* in which the Chief Justice joined, 491 U.S. at 127 n. 6, 109 S.Ct. at 2344 n. 6 (arguing that in evaluating a potential liberty interest courts should look "to the most specific level at which a relevant tradition protecting, or denying protection to, [an] asserted right can be identified"), with Justice O'Connor's concurrence in which Justice Kennedy joined, 491 U.S. at 132, 109 S.Ct. at 2346 (approving the use of tradition in explicating the Due Process Clause of the Fourteenth Amendment but rejecting "the most specific level" of generality as the sole appropriate "mode of historical analysis") and Justice Brennan's dissent in which Justices Marshall and Blackmun joined, 491 U.S. at 139, 109 S.Ct. at 2350 (noting that "the historical and traditional importance of ... interests in our society" informs, but does not dictate, the decision to recognize them as liberty interests). Perhaps the one point of consensus on the Court is that a history of state and federal laws protecting an interest lends credence to the claim that it falls within the protective scope of the United States Constitution. *But cf. Hudson v. McMillian,* --- U.S. ----, ----, 112 S.Ct. 995, 1010-11, 117 L.Ed.2d 156 (1992) (Thomas, J., dissenting) (noting robust protection of right by state common law in concluding that right is not protected by Eighth Amendment of United States Constitution).

concludes, "The attention that this "right' has received throughout state and federal statutory and common law demonstrates a history of ordered deliberation and strongly suggests that Doe's right is not "fundamental' in the sense that Doe needs the additional armature of constitutional common law to protect her." Jones Dissent slip op. at 2902 (footnote omitted). Judge Jones claims that Doe has no constitutional right because she does not need one; state and federal laws shield her.

The existence of state law protecting an interest does not, however, diminish the force of a claim for constitutional protection. *See Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944) ("state action, even though illegal under state law, can be no more and no less constitutional under the Fourteenth Amendment than if it were sanctioned by the state legislature"). *See also United States v. Raines,* 362 U.S. 17, 25, 80 S.Ct. 519, 524, 4 L.Ed.2d 524 (1960) ("It makes no difference that the discrimination in question, if state action, is also violative of state law.") (citing *Snowden*). State law may cure a constitutional violation by providing adequate post-deprivation state remedies, but only where the state may at times constitutionally infringe the interest at stake. Justice Powell recognized this distinction in *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). *See Parratt v. Taylor,* 451 U.S. 527, 542-43, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981). *See also Fee v. Herndon,* 900 F.2d 804, 808 (5th Cir.1990); *Woodard v. Los Fresnos Indep. Sch. Dist.,* 732 F.2d 1243, 1245 (5th Cir.1984).

Justice Powell in *Ingraham* established a two-stage analysis of a student's right to be free from corporal punishment. *See Ingraham,* 430 U.S. at 672, 97 S.Ct. at 1413. First, one asks whether protected interests are implicated. *Id.* at 672-74, 97 S.Ct. at 1413-14. Second, one asks whether the person who suffered the deprivation was accorded due process of law. *Id.* at 674-82, 97 S.Ct. at 1414-18. At the second stage the existence of protective state and federal law undermines, rather than supports, the conclusion that a due process violation has occurred. Only after we have recognized a fundamental liberty interest do we look to state law to see if an infringement of that interest has occurred without due process. *See id.* at 672, 97 S.Ct. at 1413.

Justice Powell noted in *Ingraham,* "Were it not for the common-law privilege permitting teachers to inflict reasonable corporal punishment on children in their care, and the availability of the

traditional remedies for abuse, the case for requiring advance procedural safeguards would be strong indeed." *Id.* at 674, 97 S.Ct. at 1414 (footnote omitted). As the state never has a legitimate basis for inflicting physical sexual abuse on a child, no set of procedural safeguards whether available before or after such a violation would meet the requirements of due process. Justice Powell's reasoning in *Ingraham* supports this conclusion: "If the common-law privilege to inflict reasonable corporal punishment in school were inapplicable, it is doubtful whether any procedure short of a trial in a criminal or juvenile court could satisfy the requirements of procedural due process for the imposition of such punishment." *Id.* at 674 n. 44, 97 S.Ct. at 1414 n. 44 (citations omitted).

Unlike in the case of corporal punishment, even "a trial in a criminal or juvenile court" prior to the infliction of physical sexual abuse on a child would not meet the requirements of due process. As physical sexual abuse of a student is never warranted, no process suffices to vitiate the rights violation such abuse involves. While state law vindicating Doe's liberty interest may comfort, it offers no basis for concluding that her interest is not fundamental or that her rights were not violated. There are powerful arguments that 42 U.S.C. § 1983 was not intended to reach episodic acts not sanctioned by state law or custom. Nevertheless, the Supreme Court rejected that reading in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) and we are not free to adopt it.

B

The next inquiry is whether the deprivation of liberty occurred under color of state law. I agree that it did. Stroud's official interactions with Doe and his sexual involvement with her together constituted an indivisible, ongoing relationship. The special attention Stroud gave Doe *as her teacher* afforded him the opportunity to exert his influence. He levered his authority to press upon Doe his sexual desires, while both on and off school grounds. He treated Doe differently than he treated other members of his class. He gave her good grades, required of her less work than other students, and allowed her to behave as she liked in his classroom. This manipulative course was an abuse of power conferred by the state. I am persuaded that Stroud acted under color of state law.

Judge Garwood's dissent commendably recognizes the relevance of this inquiry but contests this conclusion, relying on *D.T. v. Independent Sch. Dist.,* 894 F.2d 1176 (10th Cir.), *cert. denied,*

498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990), where a school coach was held not to have acted under color of state law when engaging in sexual activity with students. *Id.* at 1192. Unlike the defendant in *D.T.,* however, Stroud was Doe's teacher before, during, and after their sexual liaison. *See id.* at 1191 (emphasizing that teacher was on vacation when molestation occurred in reaching conclusion that he did not act under color of state law).

The importance of Stroud's position as Doe's teacher becomes clearer when one considers Judge Garwood's contention that Stroud did not exchange formal rewards for sexual favors from Doe. From that factual premise Judge Garwood suggests that Stroud may not have acted under color of state law. Judge Garwood's contention is tenable but not persuasive. The approval which Stroud conferred on Doe is both one of the most common and one of the most effective tools employed by teachers in affecting the behavior of their students. It is precisely this use by Stroud of his position of authority to which I point. The very official nature of this attention facilitated his efforts—and indeed enabled him—to violate her rights.

Judge Garza's dissent takes Judge Garwood's view one step further. He argues that a state actor must exercise state authority, and not merely act in an official position, before the courts will recognize action under color of state law. Again, the Supreme Court has rejected this approach. In *Monroe,* the Court dismissed the notion that " "under color of' enumerated state authority excludes acts of an official or policeman who can show no authority under state law, state custom, or state usage to do what he did." *Monroe v. Pape,* 365 U.S. at 172, 81 S.Ct. at 476.

Judge Garza, however, offers a subtle distinction. To find that action in violation of state law remains under color of state law, Judge Garza would require an exercise of otherwise legitimate authority granted by the state that extends beyond permissible limits. A state may authorize searches and seizures, for example, while a police officer nevertheless violates the Constitution by exceeding that authority. Under this view, violating state law while in the pursuit of an endeavor generally approved by the state may amount to violating the Constitution under color of state law.

The problem under this approach becomes one of characterization. It defines the relevant conduct of the state officers in *Monroe* as excessive conduct in performing a search and seizure. The

argument continues that because the state authorizes officers to perform searches and seizures, the officers acted under color of state law. *See* Garza Dissent slip op. at 2910-11. Judge Garza contrasts this rights violation with Stroud's treatment of Doe. Stroud had no authority, Judge Garza reasons, to inflict physical sexual abuse on Doe. From this fact, Judge Garza concludes that Stroud did not act under color of state law.

The parallel between Stroud's actions and those of a lawless police officer are closer than Judge Garza's dissent acknowledges. Consider, for example, *United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), in which several police officers and private citizens murdered three civil rights workers after their release from a Mississippi jail. The Court found not only that the officers acted under color of state law, but also that the private citizens "were participants in official lawlessness, acting in willful concert with state officers and hence under color of law." *Id.* at 795, 86 S.Ct. at 1157. The officers and the private citizens exercised no legitimate authority. Their motivations were racist and therefore based on private hatred. Moreover, there are no circumstances in which the police may permissibly act as judge, jury, and executioner, and none in which private citizens may play these roles. Yet the Supreme Court's decision in *Price* requires a finding of an abuse of state authority. The decision, therefore, keeps us from confining abuse of state authority to situations where state actors pursue legitimate ends. Of course, Stroud's actions are of a different order than the stunning execution of three young civil rights workers by officers and private citizens in *Price,* but his actions nevertheless were an abuse of state authority, as I have explained.

C

Finally, I identify the state actors responsible for the violation. *See Viterna,* 795 F.2d at 1209. By definition, the deprivation of a federally protected right as defined by federal standards creates a federal claim. *Id.* Nevertheless, state law is often a source in explicating violations of federal rights. Most familiar, perhaps, is our drawing on state law to determine whether a claimant had a property right protected by the Due Process Clause of the Fourteenth Amendment. *Id.* (citing *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 537, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) and *Shelton v. City of College Station,* 780 F.2d 475, 482 (5th Cir.), *cert. denied,* 477 U.S. 905, 106

S.Ct. 3276, 91 L.Ed.2d 566 (1986)). State law allows us "to identify the persons responsible for [the] identified civil rights violation." *Id.* State law is of course implicit in the conclusion that the state vested the coach with the authority he abused. State law is more obviously at work when we move beyond the immediate actor. To put the matter differently, state law guides us in circling state actors who fairly can be said to have caused Doe to be subjected to the rights violation. Caution is necessary because section 1983 imposes liability only upon persons who cause a deprivation; state law does not, in other words, furnish a theory of vicarious liability. Rather, it locates the actors—the persons. *Lopez v. Houston Indep. Sch. Dist.,* 817 F.2d 351, 355 (5th Cir.1987). A supervisor who might have acted, but did not, cannot be found liable under section 1983 for that reason alone. Under most circumstances, the supervisor could have prevented or stopped the rights violation in some way. *See City of Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989) ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done' to prevent the unfortunate incident."). Thus, if inaction sufficed as the basis for a suit under section 1983, the supervisor would effectively be vicariously liable.

The Supreme Court has adopted a standard for determining when a failure to act amounts to "a "deliberate' or "conscious' choice by a municipality." *Id.* at 389, 109 S.Ct. at 1205. The Court requires deliberate indifference. *Id.* (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) and *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)). Where a municipality's inaction demonstrates deliberate indifference toward the rights of an individual, the municipality commits an act of omission. Its failure to act rises to the level of a conscious or deliberate choice. *Id. See also Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 757 (5th Cir.1993) (applying deliberate indifference standard).

The majority recognizes that we apply the same standard to supervisors. A supervisor who acts with deliberate indifference by failing to train or oversee his subordinates may be held liable under section 1983. *See, e.g., Hinshaw v. Doffer,* 785 F.2d 1260, 1262-66 (5th Cir.1986) (applying this standard to police chief who allegedly failed to train and supervise police officer). *See also Lopez,*

817 F.2d at 355 (finding that bus driver may be liable for acting with "callous indifference" in failing to supervise students properly). An omission that evinces deliberate indifference toward the violation of an individual's constitutional rights may amount to an act that causes the violation. *Lopez,* 817 F.2d at 355; *Hinshaw,* 785 F.2d at 1263. Lankford, the principal at Stroud and Doe's school, demonstrated such deliberate indifference.

Time and again Lankford ignored Stroud's inappropriate conduct with students. Lankford did not investigate reports and allegations of Stroud's indecent behavior with any rigor. Neither did Lankford warn or discipline Stroud. On the other hand, as the majority notes, the same cannot be said of Caplinger, the superintendent. Caplinger took action when he became aware that Stroud might have been acting improperly. His response was limited, but so were his grounds for questioning Stroud's actions. Caplinger had less information than Lankford, and thus his ineffective actions do not suggest the same callous attitude. I agree, therefore, that Lankford could be held liable under section 1983 and that Caplinger cannot be.

Nevertheless, in reaching this conclusion the majority skips the potentially determining role of state law at this point in the analysis. So far we have assumed that the state placed Lankford and Caplinger in the role of supervisors. As a result, an egregious failure to fulfill their obligation to oversee Stroud's behavior would amount to action on their part. The state may, however, impose a greater obligation. It may saddle a state official with a specific duty to police the risk of unconstitutional acts by others.

In *Bush v. Viterna,* we considered whether the state imposed such an affirmative duty on the Texas Commission on Jail Standards. A class of inmates in Texas county jails sued under section 1983 asking a district court to compel the Commission to improve conditions in the county jails. 795 F.2d at 1204. In rejecting the prisoners' claim, we looked to state law to identify the person or persons responsible for maintaining the jails. We found that state law placed the county sheriffs and commissioners courts, not the Commission, in charge of the jails. *Id.* at 1206. Our analysis suggests that had the state imposed on the Commission an obligation to maintain the county prisons, the Commission's failure to fulfill that obligation would have been treated as a deliberate or conscious

choice.  If that omission had resulted in the violation of a federal right through state action, the Commission would have been properly identified as a "state ... actor responsible for causing the wrong." *Id.* at 1209.

We adopted the same approach to gauge the liability of a supervisor in *Howard v. Fortenberry,* 723 F.2d 1206 (5th Cir.1984), in which two prisoners died after being left in an oppressively hot isolation cell for almost fifteen hours. *Id.* at 1209.  We relied on state law to identify the actors responsible for ensuring that the prison did not employ this illegal form of punishment. State law placed an affirmative duty on certain prison officials to inspect the prison facilities. *Id.* at 1213.  The court reversed the district court's summary judgment in favor of these defendants, and remanded for the district court to determine their liability. *Id.* at 1214.  *See also Miller v. Carson,* 563 F.2d 757, 760 n. 7 (5th Cir.1977) ("when a state official's violation of state law causes [a constitutional violation], a federal cause of action arises under § 1983") (citation omitted); *Sims v. Adams,* 537 F.2d 829, 831-32 (5th Cir.1976) (holding that cause of action exists under section 1983 where mayor and police chief may have had obligation under state law to supervise policeman with alleged history of racial violence).

I would first look to state law to determine the nature of Lankford and Caplinger's obligations as Stroud's supervisors.  In particular, I would ask whether the state required Lankford or Caplinger to take specific action upon learning that Stroud may have been sexually abusing his students.  Texas places on a school principal the duty to discipline;  it also places the principal under the supervision of the superintendent in disciplinary matters.  Tex.Educ.Code § 21.913(a)(1) (West 1994).  The principal is responsible for "submitting recommendations to the superintendent concerning assignment, evaluation, promotion, and dismissal of all personnel."  Tex.Educ.Code § 21.913(a)(2) (West 1994).  As a result, the general obligations of supervision attach to the positions of principal and superintendent.  Texas law does not, however, make special provision for the appropriate response of a principal or superintendent to evidence of teacher misconduct.  Consider a classroom teacher in the same school as Coach Stroud who had full knowledge of Coach Stroud's activities but looked the other way.  Any moral duty aside, no one suggests that § 1983 imposes liability upon this

silent teacher. This conclusion is found in the role of state law.

In other contexts, the legislature has placed such an obligation to take affirmative action on principals. Section 21.303 of the Texas Education Code, for example, requires a principal to report, or to supervise a subordinate who will report, to the local police department reasonable grounds for suspecting the occurrence of any of several crimes in school, on school grounds, or at school-related functions. These activities include parole violations, possession of illegal drugs or lethal weapons, and involvement in organized crime. Tex.Educ.Code § 21.303(a)(1-4) (West 1994). The state legislature could have imposed a similar requirement on principals to investigate or report evidence suggesting that a teacher is involved sexually with a student. Had the legislature done so, Lankford's passivity would have been inconsistent with this duty, irrespective of whether he acted with deliberate indifference. Under such circumstances, state law would support the conclusion that Lankford caused Doe to be subjected to a rights violation at the hands of Stroud.

There is no such specific obligation under Texas law and application of the deliberate indifference standard was appropriate. I therefore join the majority's judgment, accepting Defendant Caplinger's and rejecting Defendant Lankford's assertion that he is entitled to qualified immunity as a matter of law. I agree that the school principal must on these facts take his case to a jury. A jury may ultimately not be persuaded that Lankford acted with the requisite level of indifference. I am not prepared to find its absence as a matter of law.

## II.

Implicit in the rejection of Lankford's assertion of qualified immunity is the conclusion that his legal duty was certain when breached. I find nothing in our cases to comfort the principal. The certainty of the illegality of his failure is a direct reflection of the certainty that the abuse by the coach was itself illegal under both state and federal law. If it is true that Lankford was a cause of the coach's abuse of power because he knew and was indifferent to the occurrence, there is no room for "legal" uncertainty. In every practical sense of the word this school principal was a cause of the wrong. The assertion that his "duty" to do anything was uncertain is unconvincing.

Justice Scalia pointed out in *Anderson v. Creighton,*[3] the hazards of framing the legal question at too great a level of generality. The error can be made in the opposite direction—a search so narrowed that legal nuance rises to uncertainty and ultimately confounds common sense. Qualified immunity reflects the judgment that an official ought not to be mulcted for choices made that only later prove to have been "illegal." I don't think we today put any school principal in peril or unfairly second guess this one. This was not an episodic act of an interloper to the school scheme nor the private act of a student. Rather, it was the persistent pattern of indefensible conduct of a school official, the principal's subordinate.

GARWOOD, Circuit Judge, with whom EDITH H. JONES, JERRY E. SMITH, BARKSDALE, EMILIO M. GARZA and DeMOSS, JJ., join, dissenting in part:

I dissent from so much of our judgment as affirms the denial of Lankford's motion for summary judgment on the basis of qualified immunity.[1]

So far as concerns Lankford, this is a pure non-feasance case. His inaction was deplorable. He was indecisive, insensitive, inattentive, incompetent, stupid, and weak-kneed. But it was not then clearly established—and, indeed, is not even now—that mere inaction on his part violated the United States Constitution. Lankford, a public high school principal whose position unquestionably involved the exercise of discretion, was accordingly entitled to qualified immunity, as he asserted in his motion for summary judgment. The burden then shifted to the plaintiff "to rebut this defense by establishing that the official's allegedly wrongful conduct [here, inaction] violated clearly established law." *Salas v. Carpenter,* 980 F.2d 299, 306 (5th Cir.1992). We do "not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs." *Id.*

Moreover, it is settled that an official's violation of *state* law—no matter how clearly established and plain to one in his position—does not deprive him of section 1983 qualified immunity if under the circumstances it was not clearly established that his conduct violated the *federal* right

[3]483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

[1]I concur in the holding that appellant Caplinger, the superintendent, was entitled to qualified immunity.

sued on. *Davis v. Scherer,* 468 U.S. 183, 193-95, 104 S.Ct. 3012, 3019-20, 82 L.Ed.2d 139 (1984). Further, the federal right must have been clearly established in a sufficiently "particularized" sense so that it was then "clear that a reasonable official would understand that *what he is doing* violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (emphasis added). *See also, e.g., Barts v. Joyner,* 865 F.2d 1187, 1194 (11th Cir.1989) ("*Harlow*'s "clearly established' standard demands that a bright line be crossed. The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances."); *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987) ("whether the law was clear *in relation to the specific facts confronting the public official* when he acted") (emphasis added).[2] Finally, as Judge King recently observed in a state actor's qualified immunity case with at least equally shocking facts, "[t]hat the actions of which Doe complains are egregious, however, does not mean that he has asserted the violation of a federally protected right, as required by 42 U.S.C. § 1983." *Doe v. State of La.,* 2 F.3d 1412, 1421 (5th Cir.1993) (concurring opinion).

Coach Stroud used, and abused, his position as a teacher to worm his way into the affections of his fifteen-year-old student Jane Doe so that, as the majority says, "she developed a "crush' on Stroud." As the majority relates, by late fall 1986 Stroud and Doe engaged in "kissing and petting," and in January 1987 their relationship "escalated to heavy petting and undressing" following an evening rock concert to which Stroud took Doe and some of her friends, including Stroud's daughter, also a student at the school. Doe befriended Stroud's daughter in order to have "a cover" for her relationship with Stroud and "an excuse" for visiting at the Stroud residence.[3] Apparently commencing in February 1987, Doe, with her parents' knowledge and consent, frequently spent the

---

[2]*See also, e.g., K.H. Through Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990) (although to defeat qualified immunity, a plaintiff need not "point to a previous case that differs only trivially from his case," nevertheless "[i]t is not enough, to justify denying immunity, that liability in a particular constellation of facts could have been, or even that it was, predicted from existing rules and decisions.... Liability in that particular set [of facts] must have been established at the time the defendant acted.").

[3]Doe also had a "cover" boyfriend, a fellow student at the school.

night or weekend there, ostensibly visiting Stroud's daughter. Stroud would kiss Doe on these occasions, and suggest that they have intercourse. Doe refused until, on the occasion of a visit at Stroud's residence in late March or early April 1987, when, as the panel opinion says, "she "gave into' Stroud ... sensing that Stroud was getting mad at her for not having sex with him; she was afraid of losing their friendship altogether." 975 F.2d 137 at 140. Thereafter, Doe continued to frequently visit at the Stroud home, and to engage in sexual intercourse with him there. She also began to sneak out of her house in the middle of the night to meet Stroud, and on these occasions they would go out into the country, or into the school field house, and engage in sexual intercourse. The panel opinion explains that "Doe was reluctant to refuse Stroud's sexual advances out of fear that he would alienate her completely." *Id.*

The majority concludes that by 1987 it was clearly established that public school children "have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment"—more precisely, "the substantive due process component of the Fourteenth Amendment"—against "physical sexual abuse by a school employee." Expressed at this level of generality, and assuming a not unduly broad definition of "physical sexual abuse," I agree, *provided* the employee's offending action is taken "under color of" state law. *Cf. D.T. by M.T. v. Independent School District No. 16,* 894 F.2d 1176 (10th Cir.), *cert. denied,* 498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990).[4]

---

[4] *D.T.* involved sexual molestation on June 13 and 14, 1984, by Epps, a teacher employed by the defendant school district, of three boys (ages 11, 11, and 13) who had been in Epps' fifth grade class at a district school, and had been on the school's fifth grade basketball team coached by him, during the school term that ended at the end of May 1984. The molestation occurred when the boys, with their parents' permission, accompanied Epps, staying at his home overnight, to sell candy to raise funds for a forthcoming basketball camp that was to be operated and directed that summer by another coach of the district and was to be held on school district property. The school district had approved the use of its facilities for the camp, permitted distribution at its schools to students there of fliers and notices concerning the camp, and consented to the use of a school basketball court for fund raising activity for the camp. The school district, however, did not sponsor, organize, or manage the camp. Epps was under contract with the school district and was paid for the summer months, but had no teaching, coaching, or other duties or functions to perform for the school district during June or July 1984, and would not come back on duty until August 1984. Suit was brought on behalf of the children under section 1983 against the school district on the ground, *inter alia,* that it hired Epps with knowledge of or deliberate indifference to the fact that he was a homosexual with a proclivity to molest young boys, and that his hiring was the moving force behind the sexual abuse. The Tenth

Just what sort of actions by Stroud violated this right of Doe?  The majority opinion is not entirely clear, but seems to say that it is the sexual intercourse and related fondling.  Thus, the majority says "the Constitution protects a schoolchild from physical sexual abuse—here, sexually fondling a fifteen-year-old schoolgirl and statutory rape—by a public schoolteacher."  I agree that in 1987 it was clearly established that, where sufficiently immature children are involved, *consensual* sexual relations or fondling of private parts by an adult amounted to "physical sexual abuse" for these purposes.  However, for that to be actionable under section 1983, not only must the consenting child have been sufficiently immature, but also the physical sexual abuse must have been under color of state law.

It is not clearly established that age fifteen is, *per se,* sufficiently immature.[5]  Plainly Doe was

_____

Circuit reversed a judgment on the jury's verdict for the plaintiffs, holding that as a matter of law "there was no state action involved when the plaintiffs were molested by Epps" and "Epps was not acting under color of state law when he molested the plaintiffs."  *Id.* at 1192.

[5]This is so whether one focuses on the sexual intercourse or the sexual fondling.

In Texas, for statutory rape the child must be "younger than 17 years of age." TEX. PENAL CODE § 22.011(c)(1).  *See also id.,* § 22.011(a)(2).  However, in Louisiana Doe would have attained the age of consent for purposes of statutory rape and related offenses.  *See* La.Rev.Stat. 14:43.1 (sexual battery;  "where the other person has not yet attained fifteen years of age and is at least three years younger than the offender");  14:43.3 (oral sexual battery;  same);  14:42A(4) (aggravated rape "when the victim is under the age of twelve years").  In several other states, also, Doe would have attained the statutory rape age of consent.  *See* MODEL PENAL CODE § 213.1, comment 6 at 323-325 (American Law Institute 1980);  65 AM.JUR.2D *Rape* § 17 ("The age of consent has been fixed at ages varying from 10 to 18 years.").  At common law the age of consent was ten. See MODEL PENAL CODE § 213.1, comment 6 at 323.  The MODEL PENAL CODE uses age ten for statutory rape, *id.* §§ 213.1(1)(d), 213.2(1)(d), and age sixteen for the lesser felony of "Corruption of Minors and Seduction," *id.* § 213.3(1)(a) (sexual intercourse with one less than sixteen years old where the actor is at least four years older) and for the misdemeanor of "Sexual Assault" ("touching ... the sexual or other intimate parts ... for the purpose of arousing or gratifying sexual desire";  where the victim is less than sixteen years old and the actor is at least four years older).  *See also* 18 U.S.C. § 2241(c) ("sexual act with another person who has not attained the age of 12 years");  § 2243(a) ("sexual act with another person who—(1) has attained the age of 12 years but has not attained the age of 16 years;  and (2) is at least four years younger than the" offender);  § 2244(a) ("sexual contact" an offense, with lesser penalty, where "sexual act" would be punishable under §§ 2241 or 2243);  § 2245(2) ("sexual act" defined) & (3) ("sexual contact" defined as "touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks" with harassing or sexual intent).  The common law did not recognize consensual sexual battery of a minor, but in 1861 by act of Parliament the defense of consent was disallowed "for assaults upon children under the age of 16."  MODEL PENAL CODE § 213.4, comment 1.

of a sufficient age to bear children. Perhaps that should not be the test and instead arguably a minimum age of sixteen, seventeen, or eighteen would make sense as a bright line for these purposes. But that is not, and was not, clearly established (see note 5, *supra* ).

Nor is it clearly established that Stroud's physical sexual abuse of Doe was under color of state law. The physical sexual abuse principally relied on by the majority here is the sexual intercourse, and this not only was all consensual, but also took place clearly outside of school hours and not as even a purported part of any school activity. The same is true of the "sexually fondling" or "heavy petting and undressing."[6] None of any of this could be said to even colorably be within the course or scope of Stroud's employment.[7] Nor was Doe's participation in this sexual activity some sort of "*quid pro quo* " for scholastic or other official favors from Stroud, but was rather because she had "developed a "crush' on Stroud" and did not wish to risk "losing their friendship altogether."[8]

---

At common law, the age of consent for marriage was fourteen for males and twelve for females. 52 AM.JUR.2D *Marriage* § 14; 55 C.J.S. *Marriage* § 111. In Texas for many years it was the law that, notwithstanding the statute that precluded issuance of a marriage license without parental consent where the male was under twenty-one or the female was under eighteen, "males over sixteen and females over fourteen may lawfully enter into a contract of marriage," and that lack of parental consent as called for by referenced licensing statute did not render marriage by a male over sixteen and a female over fourteen "voidable, or invalid in any respect." *Williams v. White,* 263 S.W.2d 666, 668 (Tex.Civ.App.—Austin 1954; n.r.e.).

[6]And certainly Lankford was not on any notice otherwise.

[7]*See, e.g., City of Green Cove Springs v. Donaldson,* 348 F.2d 197 (5th Cir.1965), where we held that a police officer's rape of an arrestee, shortly following completion of his arrest of her, was not within the scope of his employment. We observed, citing authorities from many jurisdictions:

"It is generally held that liability for an assault by an employee that bears no relation to the real or apparent scope of his employment or to the interest of his employer is not imposed upon the employer under the doctrine of respondeat superior." *Id.* at 202.

This is likewise the law of Texas, *Smith v. M System Food Stores,* 156 Tex. 484, 297 S.W.2d 112 (Sup.1957), as we recognized in a recent holding that a police officer's post-arrest sexual assault of the arrestee was not within the scope of his employment. *McLaren v. Imperial Casualty Co.,* 968 F.2d 17 (5th Cir.1992) (table: unpublished opinion), *cert. denied,* --- U.S. ----, 113 S.Ct. 1269, 122 L.Ed.2d 665 (1993), *affirming,* 767 F.Supp. 1364 (N.D.Tex.1991).

[8]Again, Lankford clearly was not on any notice otherwise.

This is not to say that Stroud did not use and abuse his position as a teacher, and thus arguably act under color of law, in initially causing Doe to develop a "crush" on him and in worming his way into her affections. But this is not the constitutional wrong that the majority holds that Doe has suffered and for which Lankford lacks qualified immunity; that wrong, the "physical sexual abuse—here, sexually fondling a fifteen-year-old schoolgirl and statutory rape," came later, albeit doubtless in some sense as an ultimate result of the former conduct. Does the causal connection between the earlier "under color of law" conduct and the later otherwise purely personal and consensual relationship between this fifteen-year-old girl and Stroud cause the latter conduct to also be "under color of law"?[9] In my view, an affirmative answer to that question is not and was not clearly established as a matter of constitutional law.[10]

I turn now to particularly consider the basis on which the majority holds that Lankford has failed to establish his entitlement to qualified immunity.

The majority (fn. 3) does *not* take the position that school officials have "an affirmative duty

---

[9]For example, in the *D.T.* case, see note 4 *supra,* the prior teacher/coach—student/player relationship was doubtless a causative factor in the teacher/coach's ability to molest the students within a couple of weeks after the end of the school term in which he had taught and coached them, but his actions were nonetheless held not to be under color of law.

[10]The special concurrence takes the view that Stroud acted under color of state law in that "[t]he special attention Stroud gave Doe *as her teacher* afforded him the opportunity to exert his influence.... He gave her good grades, required of her less work than other students, and allowed her to behave as she liked in his classroom." As the majority puts it, "all of this attention flattered Doe, and she developed a "crush' on Stroud." However, as noted in the text, even though Stroud may have acted under color of law in causing Doe to develop a "crush" on him, *that* did not invade or violate her constitutional liberty interest in "bodily integrity" or to be free from "physical sexual abuse." Certainly there was—and is—no clearly established law to the contrary. The invasion of bodily integrity here the intercourse and sexual fondling—was not a *quid pro quo* for official favoritism from Stroud (and neither the majority nor the special concurrence claim otherwise), but was consensual *if* Doe was competent to consent to such conduct. Contrary to the implication of the special concurrence, Doe's age is hence highly relevant, indeed crucial, and it cannot be clearly established that Stroud's "physical sexual abuse" was under color of law merely because it was an eventual outgrowth of the "crush." No even remotely analogous decision is cited even tending to support such a holding. The approach of the special concurrence would necessarily find a constitutional invasion in the state college professor-adult student setting, where the teacher abused her official position to cause the student to develop a "crush" on her and as an eventual result the two later had consensual sexual relations while the college was in session. Surely it is not clearly established that such wholly consensual sexual relations are under color of law or a violation of the adult student's right to bodily integrity. We have turned the concept of "clearly established" on its head.

to protect students from constitutional violations" arising out of a "special relationship" between the state and the students in its public schools analogous to that existing between the state and those in its institutional custody, such as prisoners, as discussed in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 195-98, 109 S.Ct. 998, 1003-1005, 103 L.Ed.2d 249 (1989). Certainly, no such principle can be regarded as clearly established.[11]

Notwithstanding this disclaimer of a "special relationship" affirmative duty, the majority proceeds to impose on Lankford an affirmative duty—not to fail with deliberate indifference to act—of the very same kind imposed in favor of prisoners on prison supervisors, respecting protection not only from other inmates, but also from the actions of guards and from various conditions of confinement. *See Wilson v. Seiter,* --- U.S. ----, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

The majority's decision as to Lankford is *not* grounded on the assumption that the evidence supports a finding that Lankford took any action or did anything affirmative that played any part in causing Stroud's physical sexual abuse of Doe. The majority does not contend that Stroud's physical sexual abuse of Doe came about because Stroud had received Lankford's tacit or implied approval of such conduct.[12] Indeed, the three-part test that the majority devises to determine personal liability

---

[11]Post-*DeShaney,* at least three circuits have held that the public school setting does not give rise to a "special relationship" imposing a due process affirmative duty to protect students. *See Maldonado v. Josey,* 975 F.2d 727, 730-733 (10th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1371-72 (3d Cir.1992) (en banc), *cert. denied,* --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *J.O. v. Alton Community Unit Sch. Dist. 11,* 909 F.2d 267, 272 (7th Cir.1990).

[12]I note that there is no evidence Stroud's earlier unduly familiar conduct with other female students ever involved physical sexual abuse. The majority does not contend that there is any evidence that, apart from Jane Doe, Stroud ever violated any student's constitutional due process right to be free from physical sexual abuse.

The majority does refer to the May 1986 incident in the darkened library copy room when the librarian observed "Stroud lifting the female students onto a table and catching them as they jumped off of the table into his arms." While the librarian may have used the term "child molestation" in discussing this incident with Stroud, her testimony was not that she thought Stroud was sexually molesting the students; she rather stated "I just thought he was being too playful with them, I guess, in a wrong way." The majority also notes evidence that on or about the same day in October 1987 that Caplinger suspended Stroud, another female student reported to her mother, who advised Caplinger, that "Stroud had grabbed the student's buttocks in class that day." There is no evidence of the truth of this allegation, and, in any event, it relates to a matter well after the fact.

of supervisors contains no element of affirmative conduct, communication of condonation or authorization, or the like on the supervisor's part. Such a t est, applied outside of the "special relationship" context, is essentially inconsistent with the Supreme Court's decision in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The Third Circuit so held in *Chinchello v. Fenton,* 805 F.2d 126, 133 (3rd Cir.1986), stating:

> "In *Rizzo v. Goode,* 432 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court addressed and rejected the argument that a supervising public official has an affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates. It held that even where a pattern of constitutional violations by subordinates is shown, supervising officials do not violate the constitutional rights of the victims of such misconduct unless they have played an *"affirmative part'* in that misconduct. *Id.* at 377, 96 S.Ct. at 607.

> . . . . .

> In *Commonwealth of Pennsylvania v. Porter,* 659 F.2d 306 (3d Cir.1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982), this court, sitting *in banc,* again addressed the issue of whether there is an *affirmative* constitutional *duty* to supervise.... We held that to be legally responsible, supervising officials "must have played an *affirmative role* in the deprivation of the plaintiffs' rights,' noting that "the officials' misconduct *cannot be merely a failure to act.* ' 659 F.2d at 336. Because "the Council members' official actions constitute[d] *no more than inaction and insensitivity,* ' 659 F.2d at 337, we concluded that they had not violated the plaintiffs' rights *despite their knowledge* of a pattern of misconduct by one of their subordinates."

> ... *Black v. Stephens,* 662 F.2d 181 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982) ... held, once again, that while supervising public officials may not in any way authorize, encourage, or approve constitutional torts, they have *no affirmative* constitutional *duty to* train, *supervise* or discipline so as to prevent such conduct.

> It is true ... that some Courts of Appeals have been more willing than ours to infer supervisory approval of unconstitutional conduct from inaction on the part of the supervisor.... The courts taking this view, however, have found liability only where there are *both* (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, *and* (2) circumstances under which the supervisor's inaction could be found to have *communicated a message of approval* to the offending subordinate." (Footnote omitted; emphasis added).

The Third Circuit reaffirmed the *Chinchello* analysis of *Rizzo* and its progeny in *Brown v. Grabowski,* 922 F.2d 1097, 1119-1120 (3d Cir.1990), *cert. denied,* --- U.S. ----, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

Contrary to the implication in the majority opinion, the same principles were affirmed by the

---

Further, there is no evidence that any School District official or employee other than Stroud ever engaged in physical sexual abuse of any student.

Third Circuit in *Stoneking v. Bradford Area School District,* 882 F.2d 720 (3rd Cir.1989) (*Stoneking II* ), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990), although the panel split as to their application to the particular facts in that case. *Stoneking II* was a suit by a female public school student complaining that the school's band director, Wright, "used physical force, threats of reprisal, intimidation and coercion ... to force her to engage in various sexual acts" some of which "occurred in the band room at the school and on trips to band functions." *Id.* at 722. The Third Circuit majority held that Smith, the school principal, and Miller, the assistant principal, were not entitled to summary judgment on the basis of qualified immunity, but that the superintendent of the school district, Shuey, was entitled to summary judgment on that basis. Reviewing *Rizzo, Chinchello,* and related cases, the majority summed up the relevant law as being that "although the mere failure of supervisory officials to act or investigate cannot be the basis of liability," nevertheless "such officials may not with impunity maintain a custom, practice or usage that communicated condonation or authorization of assaultive behavior." *Id.* 882 F.2d at 730.[13] The panel majority concluded that there was sufficient evidence for a jury to find that affirmative conduct and policies of Smith and Miller "amounted to a communication of condonation" to Wright and that there was an "affirmative link" between the plaintiff's "injury and policies and practices that Smith and Miller employed and *affirmative acts* they took in furtherance of them." *Id.* at 731 (emphasis added).[14] On the other hand,

---

[13]The dissent did not disagree with these principles, but felt that their application to the particular facts there warranted summary judgment in favor of all the individual supervisor defendants. *Id.* at 731-32.

[14]The evidence relied on included testimony by female student and band member Judith Grove Showers that she was "sexually assaulted by Wright in 1979 and reported the incident to Miller and Smith" and that Smith told her it was her fault. *Id.* at 727. She and her father further testified that thereafter Miller presented her "with the option of recanting her story in front of the band or withdrawing from all band activities ... the band was assembled and she was called before it for this purpose, but fled from the room in tears." *Id.* at 728. The Third Circuit observed:

> "As the district court noted, it could be inferred that "the "forced apology" served as a trump card in the hands of Edward Wright,' who could threaten his other victims with similar treatment if they reported his actions, ... and Stoneking in fact testified that she did not report Wright's assaults because "I knew about Judy Grove and what happened.' " *Id.*

Moreover, in *Stoneking* there was also another teacher in the same school who engaged in physical sexual abuse of female students. One victim of this other teacher

Superintendent Shuey was entitled to summary judgment because the case against him amounted to "mere "inaction and insensitivity' on his part" and the court could not "discern from the record any *affirmative acts by Shuey* on which Stoneking can base a claim of toleration, condonation or encouragement of sexual harassment by teachers." *Id.* at 731 (emphasis added).

Similarly, in *J.O. v. Alton Community Unit School Dist. 11,* 909 F.2d 267 (7th Cir.1990), the court considered a section 1983 complaint against supervisory public school officials, including the principal and superintendent, alleging that one Lester Mann "sexually molested" the plaintiff school children "while employed as a teacher" at their school. *Id.* at 268. The complaint proceeded on the basis that the defendants had "an affirmative duty to provide for their safety," but the Court rejected that theory, even though the offending actor was a public school teacher, and held that the complaint was insufficient because it did "not allege that any of the named school defendants participated in any acts of child molestation. In addition, the plaintiffs do not allege that the school defendants promoted school policies that "encourage[ed] a climate to flourish where innocent [children] were victimized.' " *Id.* at 271-272, citing *Stoneking II.*

Likewise, the Sixth Circuit has recognized that mere inaction by a supervisor, *even when actually aware of a governmental subordinate's constitutional violations,* does not afford a sufficient basis for liability under section 1983. Thus, in *Poe v. Haydon,* 853 F.2d 418, 429 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989), the Court stated:

> "On the issue of § 1983 liability of supervisory personnel, *Hays v. Jefferson County,* 668 F.2d 869 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982), established that a supervisory official's failure to supervise, control, or train the offending individual is not actionable, unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it.' *Id.* at 874. *See also Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d

---

testified that she promptly reported the incident to Miller and Smith, who told her "it would be her word against the teacher's and that *she should not tell her parents.*" *Id.* at 727 (emphasis added). At least five complaints, by different female student victims, were made to Miller and Smith concerning "sexual assaults" by teachers and staff members at the school. Corrective action was not taken. *Id.* at 728-29. In one of the incidents, Smith suggested to the victim that she might be "framing" the teacher. *Id.* at 728.

Notwithstanding this showing—and nothing remotely comparable is shown here—the *Stoneking II* panel was divided in its denial of qualified immunity to the principal and assistant principal, though unanimous in favor of the superintendent.

93 (1984).

Poe's sexual harassment claim fails on this latter score. Even assuming the allegations in her complaint are true, she has not averred that "any of the supervisory officials who [are] defendants in this case *actively* participated in or *authorized* any harassment' by Henderson. *Bellamy,* 729 F.2d at 421. At best, she has merely claimed that the *appellants were aware* of alleged harassment, *but did not take appropriate action. This is insufficient* to impose liability on supervisory personnel under § 1983. *Ibid.* " (Emphasis added).

Similar expressions can be found in the decisions of this Court. See, for example, the following from *Reimer v. Smith,* 663 F.2d 1316, 1323-24 (5th Cir.1981):

"In *Wanger v. Bonner,* 621 F.2d 675 (5th Cir.1980), we stated that a supervisory official could not be held liable for failing to adopt policies to prevent constitutional violations, but could be held liable if he affirmatively adopted policies which were wrongful or illegal and which caused the alleged deprivation of constitutional rights.[5] ...

[5.] In *Watson, supra* [*Watson v. Interstate Fire and Casualty Co.,* 611 F.2d 120 (5th Cir.1980) ], a plaintiff filed a § 1983 suit for her arrest, incarceration, and subsequent commitment to a mental hospital. She sued the deputies who arrested her, and also sued the sheriff of the Parish for failure to supervise his deputies. The court held that this was an insufficient basis for liability under § 1983, absent the sheriff's involvement in a pattern of activity designed to deny the plaintiff her constitutional rights, citing *Rizzo v. Goode,* 423 U.S. 362, 375-76, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976)."

As *Reimer* 's footnote 5 observes, *Watson,* 611 F.2d at 123, specifically relied on *Rizzo.* Likewise, the similar statement in *Wanger* that "failure to adopt policies to prevent constitutional violations ... would not be an adequate basis for [a supervisor's] liability under § 1983," *id.,* 621 F.2d at 680, was also expressly based on *Rizzo.* Similarly we stated in *Ford v. Byrd,* 544 F.2d 194, 195 (5th Cir.1976), that a police chief is "liable for the acts of his subordinates *only* if he directs, orders, participates in, or approves the acts." (Emphasis added). And, in *Vela v. White,* 703 F.2d 147, 153 (5th Cir.1983), the opinion of the district court, which we said "we hereby adopt," states:

"... a supervisory official cannot be liable merely for failing to adopt policies to prevent constitutional violations; however, he can be held liable if he affirmatively adopts policies which are wrongful or illegal. *Reimer v. Smith,* 663 F.2d 1316, 1323 (5th Cir.1981); *Wanger v. Bonner,* 621 F.2d 675 (5th Cir.1980). *See also Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 48 L.Ed.2d 561 (1976), holding that in the absence of a pervasive pattern of intimidation by the *named* defendants, supervisory failure to act in the face of a statistical pattern of violations by other officers fails to state a claim cognizable under § 1983."

As recently as 1992 we stated: "Supervisory officials may be held liable *only* if: (i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury." *Mouille v. Live Oak, Tex.,* 977 F.2d

924, 929 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993) (emphasis added).

Our decisions in this area—like those of the other circuits—are, unfortunately, not all of one piece.[15]  We have said that "personal participation" is not the only basis for imposing section 1983 liability on a supervisor, and that "a supervisory defendant is subject to § 1983 liability when he breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury." *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976).[16]  *Sims* was decided before *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and after *Monell* we rejected our earlier cases that had "held that where state law would impose vicarious liability, a like cause of action arose under § 1983." *Baskin v. Parker,* 602 F.2d 1205, 1207 (5th Cir.1979).  Judge Rubin dissented in *Baskin,* contending that *Monell* did not preclude resort to state law for this purpose.  *Baskin* at 1211-1215.  Nevertheless, we thereafter from time to time continued to rely on *Sims* for the proposition that even without personal participation a supervisory official may be held personally liable under section 1983 if he "breached a duty imposed upon him by state and local law and ... this breach caused the plaintiff constitutional injury.  *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976)." *Barksdale v. King,* 699 F.2d 744, 746 (5th Cir.1983).  *See also Lozano v. Smith,* 718 F.2d 756, 768 (5th Cir.1983) (same);  *Bowen v. Watkins,* 669 F.2d 979, 988 (5th Cir.1982) ("plaintiffs must show a failure to supervise properly that caused the harm.  See *Sims v. Adams,* (5 Cir.1976), 537 F.2d 829.").  So far as these decisions impose personal liability for nonfeasance and proceed on the basis of there being a duty to act affirmatively, many are consistent with *DeShaney* in that they involve a "special relationship," such as that of prison or jail officials to their prisoners.

---

[15]This is perhaps not surprising considering the somewhat tortuous development of section 1983 jurisprudence beginning with *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

[16]In the latter connection, *Sims* cites only *Roberts v. Williams,* 456 F.2d 819 (5th Cir.), *cert. denied,* 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971);  it separately, but perhaps relatedly, cites *Anderson v. Nosser,* 456 F.2d 835 (5th Cir.), *cert. denied,* 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972), and *Burton v. Waller,* 502 F.2d 1261, 1274-75 n. 6A (5th Cir.1974), *cert. denied,* 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975).  None of these authorities supports the statement as to state law duties quoted in the text.

*Barksdale* and *Lozano,* for example, fall in this category.[17]  But reliance on state law duties seems inappropriate, as we observed in *Baskin* and as indicated by subsequent Supreme Court decisions. *See DeShaney,* 489 U.S. at 189, 109 S.Ct. at 998 ("A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes.  But not "all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment.' ");  *Daniels v. Williams,* 474 U.S. 327, 334, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986) ("Jailers may owe a special duty of care to those in their custody under state tort law ... but ... we reject the contention that the Due Process Clause of the Fourteenth Amendment embraces such a tort law concept.");  *Davis v. Scherer* (rejecting breach of state law duties as a basis to deny qualified immunity under section 1983).  *See also Thompkins v. Belt,* 828 F.2d 298, 304 n. 8 (5th Cir.1987) ("... recent Supreme Court decisions call into question the proposition that a breach of duties imposed by state law can form the basis of an action under section 1983").

The majority's reliance on *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), is misplaced.  To begin with, that case was not decided until some two years after the events here in issue, and the Supreme Court described the "inquiry" before it there, which was "the principal focus" of its decision, as "a difficult one;  one that has left this Court deeply divided in a series of cases that have followed *Monell*...."  *Id.* at 385, 109 S.Ct. at 1203 (footnote omitted). Surely *Canton* did not represent clearly established law in 1986 or 1987, and hence should not be relied on to deny Lankford qualified immunity.[18]

Aside from the question of timing, *Canton* 's applicability to the personal liability of individual

---

[17]What the majority characterizes as holding in *Hinshaw v. Doffer,* 785 F.2d 1260 (5th Cir.1986), is dicta.  What we actually *held* there was that the defendant chief of police was entitled to a directed verdict of no liability.  *Id.* at 1265-66.

[18]The majority is similarly in error in denying Lankford qualified immunity on the basis of *Jefferson v. Ysleta ISD,* 817 F.2d 303 (5th Cir.1987), and *Lopez v. Houston ISD,* 817 F.2d 351 (5th Cir.1987).  The majority holds Lankford may be found liable for failing, between Valentine's Day and late March or early April 1987, to take action so that the Stroud-Doe "relationship might have been derailed at that point."  Not only are the cited cases quite inapposite—*Jefferson* involves tying an eight-year-old student to her desk all day as school discipline and has no discussion of supervisory (or municipal) liability, and *Lopez* held the supervisors were not liable for the bus driver's wrongful conduct (which in effect imprisoned the student in the bus while the driver knew he was being beaten)—but neither was handed down until late May 1987.

public school supervisors is doubtful. *Canton* held that in appropriate circumstances a *municipality* could be liable for constitutional violations resulting from its deliberately chosen training policy for city employees. It is one thing to hold the municipality as a whole liable in such an instance, as the entire corporate entity doubtless has the complete responsibility for and power and control over the training, assignment, and utilization of its employees, and the corporate enti ty as a whole is the recipient and beneficiary of their services. The case of individual supervisors is distinctly different. Here, for example, Lankford was not the only one in control of or responsible for Stroud; the athletic director and superintendent (and doubtless others) were also involved. Lankford did not hire Stroud and could not fire him, and Stroud did not work for Lankford. Further, when one looks at municipal liability cases of the *Canton* sort, although the primary focus may be on a policy that consciously elects *not* to do something—in *Canton not* to train beyond a certain level—there is also (at least in the absence of a "special relationship") a concomitant and causal *affirmative* election and action—in *Canton,* to have the decision whether arrestees detained in jail required medical care committed to the sole discretion of the inadequately trained shift commander;[19] in other cases, to arm police officers and put them on the streets with directions to use their weapons as appropriate.[20] Nothing of the kind on the part of Lankford is involved here; he is held liable merely on the basis of inaction. *Canton* does not support personal liability of an individual supervisor for mere failure to act absent a "special relationship" imposing such a duty.

The majority, in holding *Canton* to be apposite in this appeal, relies on *Sample v. Diecks,* 885 F.2d 1099 (3d Cir.1989); *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990); *Stoneking II;* and *Jane*

---

[19]*Canton* assumed, *arguendo,* that the plaintiff's constitutional right to receive medical care while in detention was violated. The *Canton* plaintiff, as an arrestee detained in jail, was apparently in the sort of "special relationship" with the City that placed on it the *affirmative* obligation of protection, a relationship that does not exist here.

[20]*Cf. Languirand v. Hayden,* 717 F.2d 220 (5th Cir.1983), a section 1983 suit against the city for injuries suffered when one of its policemen, inadequately trained in weapons use, shot at the plaintiff's car, where we held that city section 1983 liability for failure to train was not made out, and that "if" such a case would lie it would require "at least" evidence of "a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force." *Id.* at 227-28.

*Doe "A" v. Special School Dist.,* 901 F.2d 642 (8th Cir.1990). These decisions, however, do not support the majority's imposition of an affirmative duty on Lankford, much less its denial of qualified immunity to him. To begin with, both *Sample* and *Greason* are prison inmate cases, thus involving that sort of "special relationship" where the Constitution *does* impose an affirmative duty, as recognized in *DeShaney,* a relationship which the majority disclaims here. Moreover, it is obvious that the majority misreads *Sample.* There the Third Circuit *reversed* a judgment against the supervisor following a bench trial, holding that the trial court's findings did not meet the requirements of *Canton* for establishing municipal liability.[21] Read in context, *Sample* 's "no less stringent" language quoted by the majority is plainly saying that the section 1983 plaintiff has *as least as high* a hill to climb to establish a supervisor's liability on a *Canton* type theory as to thereby establish a municipality's liability. To read the statement, as the majority apparently does, to say that the plaintiff's hill for recovery against a supervisor is *no higher than* for recovery against a municipality renders the statement meaningless in the context in which it was made, namely as an explanation of why the judgment against the supervisor could not stand. *Jane Doe A* and *Stoneking II* are similarly inapposite.[22]

The three-part test devised by the majority to sustain the denial of qualified immunity to Lankford requires absolutely no finding of any affirmative conduct on his part, nor even any actual knowledge of the physical sexual abuse,[23] and nevertheless allows a finding that simple inaction by

---

[21]The Third Circuit did not address the supervisor's qualified immunity.

[22]In *Jane Doe A* the Eighth Circuit affirmed a summary judgment for all defendants, the School District as well as the individual supervisors. Only in connection with the School District's liability did the Eighth Circuit cite or refer to *Canton. Id.* 901 F.2d at 646. *Canton* was not cited at all respecting the individual defendants. Nor did the court address qualified immunity.

In *Stoneking II,* the Court does cite *Canton* in its general discussion of liability, *id.* 882 F.2d at 725, but does not state that it applies to supervisors, and does not refer to it in its discussion of qualified immunity, *id.* at 726-731, where it notes that "the mere failure of supervisory officials to act or investigate cannot be the basis of liability" but "such officials may not with impunity maintain a custom, practice or usage that communicated condonation or authorization of assaultive behavior." *Id.* at 730.

[23]The majority only requires knowledge of facts "plainly pointing toward the conclusion that" such was occurring. In fact, no one—other than Stroud or Doe—witnessed or otherwise knew of physical sexual abuse of Doe by Stroud or even told Lankford that such was likely occurring.

the supervisor "causes" the constitutional injury within the meaning of section 1983, even though this is not a "special relationship" case where the Constitution imposes an affirmative duty. In no reasonable sense of the word "causes" can Lankford's pure inaction—not amounting to tacit or implied condonation or authorization—be said to have "caused" Stroud's physical sexual abuse of Doe. As the Supreme Court observed in *Rizzo,* "[s]uch reasoning, however, blurs accepted usages and meanings in the English language in a way which would be quite inconsistent with the words Congress chose in section 1983." *Id.* 423 U.S. at 374, 96 S.Ct. at 606.[24] For the reasons previously stated, *Canton*—a municipal liability case where the *municipality's affirmative conduct* (arresting and detaining the plaintiff and causing the decision as to her need for medical treatment to be made by unqualified municipal employees) *was plainly a cause* of the injury in the accepted sense of the word—is not to the contrary.[25] Even if it were, its standards should not be retroactively applied to deny qualified immunity here.

Doe even fooled her parents.

> The effect of this standard will almost inevitably be to in practice reduce the purported "deliberate indifference" test to one of negligence. If the supervisor—like Lankford here—does not know of the subordinate's physical abuse of the victim, the supervisor may nonetheless be liable if the facts that he did know are ones the Court characterizes as "pointing plainly toward the conclusion that" the sexual abuse was occurring. The supervisor, however,—due to inattention or stupidity—may not have drawn that conclusion, but is nevertheless held liable. Such liability is, in essence, liability based on negligence. In the real world of litigation, that is how these cases will be fought out.

[24]The majority's attempt (maj. op. fn. 6) to distinguish *Rizzo* on the basis of *Monell* is misplaced. *Monell*—like *Canton*—was concerned *only* with *municipal* liability. *Rizzo*—like this appeal—was *not* concerned with municipal liability, but only with whether individual supervisors had violated section 1983 by their inaction in the face of violations by their subordinates. The majority has no power to overrule *Rizzo,* that right being reserved to the Supreme Court.

[25]The majority, fortunately, does not adopt the special concurrence's view that if the state legislature had imposed on principals a requirement to investigate or report evidence suggesting that a teacher is involved sexually with a student, then Lankford's mere "passivity" would suffice to impose section 1983 liability on him for Stroud's conduct *even if* Lankford were not deliberately indifferent. The special concurrence does not mention any other fault requirement, such as negligence or gross negligence. Apparently, some form of strict liability is contemplated. It is difficult to see how this is consistent with *Canton's* statement that "a lesser standard of fault" than deliberate indifference should be rejected because it "would result in *de facto respondeat superior* liability on municipalities," would "engage the federal courts in an endless exercise of second-guessing," and "would implicate serious questions of federalism." *Id.,* 489 U.S. at 390, 109 S.Ct. at 1206.

I therefore respectfully dissent.

EDITH H. JONES, Circuit Judge, with whom GARWOOD, JERRY E. SMITH, BARKSDALE, EMILIO M. GARZA and DeMOSS, Circuit Judges, join, dissenting:

Justice Holmes wrote, "I have said to my brethren many times that I hate justice, which means that I know that if a man begins to talk about that, for one reason or another he is shirking thinking in legal terms." *The Mind and Faith of Justice Holmes,* 435 (M. Lerner Ed. 1943), *cited in* Raoul Berger, *Government by Judiciary,* 289 n. 24 (1977).

The same axiom might be applied to modern-day substantive due process, particularly to my colleagues' airy assumption that Doe had a clearly established constitutional "substantive due process" right or liberty interest protecting her against "sexual fondling and statutory rape" by a school teacher. The majority must reach this conclusion so that they can hold that the school principal lacks qualified immunity for having poorly supervised the lecherous coach who plotted and consummated Doe's seduction. If the principal is cast in judgment by a jury verdict, Doe can then recover § 1983 damages and attorneys' fees.

I laud and join in the majority's morally outraged condemnation of what happened to this young girl.[1] But I question whether the fact that our collective conscience is shocked is a good enough reason for writing an opinion that broadens constitutional remedies in three novel ways. To afford Doe a compensable constitutional claim, the majority must first define a hitherto unrecognized and still-vague constitutional right against sexual molestation of underage minors.[2] Second, the

---

[1]Nothing could be further from the truth than Judge Higginbotham's assertion that the dissenters in this case see only "casual sex." Coach Stroud committed a crime for which he has served jail time. But not every state employee who commits a crime while on or around his job *necessarily* violates the victim's constitutional rights.

[2]The Supreme Court has not specifically recognized the substantive due process right or liberty interest of a fifteen year old student in her bodily integrity against "a teacher who uses his authority to sordid sexual ends." The lower court cases the majority cite for this kind of proposition all trace back to two sources: *Ingraham v. Wright,* 430 U.S. 651, 660 n. 12, 97 S.Ct. 1401, 1406 n. 12, 51 L.Ed.2d 711 (1977), and *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

        Judge Higginbotham's concurrence suggests that Doe's "fundamental right" stems *a fortiori* from the Supreme Court's decision in *Ingraham v. Wright,* which held that Fourteenth Amendment liberty interests are implicated by the decision of school authorities to inflict corporal punishment on a student. 430 U.S. at 675, 97 S.Ct. 1414.

majority impute state action to the coach's conduct, which by no stretch of the imagination was ever undertaken in the scope of a teacher's pedagogical authority.[3]  Third, the majority must strain to reconcile their theory of constitutional supervisory liability with facts that show, at most, negligence by the principal.[4]  How far each of these tortuously reasoned steps to liability will be expanded by subsequent caselaw, I cannot predict.  But to assert that these propositions were "clearly established" in 1987 is an extravagant overstatement.

---

The Court also held that as the demands of procedural due process were adequately met by the common law, no constitutional due process violation occurred.  430 S.Ct. 684, 97 S.Ct. 1419.  *Ingraham refused* to determine whether a student has a substantive due process right against corporal punishment.  With all due respect, it is a long step from deciding the procedural attributes of corporal punishment to enunciating a right to "freedom of bodily integrity against a teacher who pursues sordid ends."  No other court has cited *Ingraham* for this proposition.  Taken literally, Judge Higginbotham's view would seem to constitutionalize any intentional tort committed by a school teacher upon a student, for *all* conduct may be described *post hoc* as "abuses of power."  *Ingraham* did not go so far;  it speaks *only* of punishment.

*Rochin* enunciated a criminal suspect's substantive due process "right to bodily integrity" not to have his stomach pumped.  While *Rochin* has frequently been cited by the Supreme Court for Justice Frankfurter's explanation of substantive due process, its precise holding has been significantly undercut by *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  In *Graham,* the Court rejected a general substantive due process right against excessive force used on arrestees in favor of a right grounded squarely in the Fourth Amendment, textually the most specifically applicable constitutional provision.  Since *Rochin,* only in abortion-related cases has the Court spoken of a "fundamental right" related to bodily integrity.

Few lower court cases outside the Fifth Circuit have embraced this substantive due process right of students not to be sexually molested by teachers.  *See Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 722, 727 (3d Cir.1989).  Other circuit court decisions, while rejecting supervisory liability of schools for teachers' molestation of students, have merely assumed *arguendo* the existence of this liberty interest.  In none of them were school supervisors held liable.  *See, e.g., Jane Doe A. v. Special Sch. Dist. of St. Louis County,* 901 F.2d 642, 646-47 (8th Cir.1990);  *D.T. by M.T. v. Independent Sch. Dist. No. 16,* 894 F.2d 1176, 1186-87 (10th Cir.1990), *cert. denied* 498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990);  *Spann v. Tyler Independent Sch. Dist.,* 876 F.2d 437, 438 (5th Cir.1989), *cert. denied* 493 U.S. 1047, 110 S.Ct. 847, 107 L.Ed.2d 841 (1990).  These lower court cases simply did not consider the question of a fundamental liberty interest.

The majority's recitation of supporting authority, in short, is deceptive.  The "clearly established right" not to endure sexual molestation by a teacher is not clear at all.

[3]*See* Judge Garza's and Judge Garwood's dissents.

[4]*See* Judge Garwood's dissent, in which I concur.

What is certain is that the majority's opinion and result are unnecessary either to vindicate Doe's rights or to instill in public school administrators an incentive to prevent lecherous escapades by teachers with students. Ordinarily, the heavy guns of constitutional law—particularly a subjective doctrine like substantive due process—should be deployed in service of goals that implicate basic policies of government. The Supreme Court has frequently "rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Collins v. City of Harker Heights,* --- U.S. ----, ----, 112 S.Ct. 1061, 1070, 117 L.Ed.2d 261 (1992) (citing cases). The Court's reluctance derives from its recognition of the gravity and scope of constitutional decision making:

> The Fourteenth Amendment is a part of a Constitution generally designed to allocate governing authority among the Branches of the Federal Government and between that Government and the States, and to secure certain individual rights against both State and Federal Government. When dealing with a claim that such a document creates a right ..., we bear in mind Chief Justice Marshall's admonition that "we must never forget, that it is *a constitution* we are expounding." *McCulloch v. Maryland,* 4 Wheat. (17 U.S.) 316, 407, 4 L.Ed. 579 (1819) (emphasis in original). Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that " "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States,' " *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976), quoted in *Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 1917[, 68 L.Ed.2d 420] (1981).

*Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986).

There is no systemic abuse of institutional power exemplified in this case, because no state agency, school, school superintendent or principal would ever condone what happened to Doe. Similarly, only by *ipse dixit* does the majority support its belief that Stroud's conduct was an abuse of state power. He was committing a crime just as surely as if he had stolen Doe's watch. Ordinarily, a state actor may point to some state policy in support of his actions. A court's job is to say how that proffered policy stacks up against constitutional protections. Here, there is no policy to be tested. The motive for Stroud's conduct was crass self-gratification. The Constitution has little to say about state actors who commit ordinary crimes for their own benefit. *Compare Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). That task is better left to statutory and common law. "It is no reflection on either the breadth of the United States Constitution or the importance of

traditional tort law to say that they do not address the same concerns." *Daniels,* 474 U.S. at 333, 106 S.Ct. at 666.

Not only is there no broad constitutional purpose to be served by recognizing for Doe's benefit a constitutional right not to have her bodily integrity compromised by a teacher's sexual abuse, but the constitutional remedy that the majority strives to assure her is merely redundant of well-established criminal, tort and statutory sanctions. Coach Stroud went to jail for committing statutory rape. Doe has state-law tort claims available against Stroud for assault and battery and intentional infliction of emotional distress. Most significant, perhaps, is her personal Title IX claim against the school district, which, in exchange for use of federal funds, rendered itself potentially liable for this type of sex harassment case. *Franklin v. Gwinnett County Public Schools,* --- U.S. ----, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Doe in fact had a Title IX claim pending in state court when this case was orally argued *en banc.*[5]

The majority's opinion accomplishes no more than to provide Doe another type of money damage award for the injury she has suffered. Where no larger issue than this is at stake—no issue touching upon fundamental questions of school governance or the authority of the state over its teachers or students—the invocation of a new constitutional right is at best superfluous, at worst mischievous. Nowhere in their opinions do the majority or concurrence acknowledge that the precepts of liability they have announced rest on an untested constitutional theory. Their lack of either circumspection or introspection is curious and contradictory of the Supreme Court's approach to the troublesome concept of substantive due process:

> As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended. *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 225-226, 106 S.Ct. 507, 513-514, 88 L.Ed.2d 523 (1985). The doctrine of judicial self-restraint

---

[5]In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court rejected a claim that a defamation action against state officials stated a § 1983 due process claim. The Court pointedly observed "[I]f the same allegations had been made about [plaintiff] by a private individual, he would have nothing more than a claim for defamation under state law. But, he contends, since [defendants] are respectively an official of city and county government, his action is thereby transmuted into one for deprivation by the state of rights secured under the Fourteenth Amendment." 424 U.S. at 698, 96 S.Ct. at 1159. The Court, unlike the majority here, would have none of it.

requires us to exercise the utmost care whenever we are asked to break new ground in this field.

*Collins v. City of Harker Heights,* --- U.S. at ----, 112 S.Ct. at 1068. *See also Albright v. Oliver,* --- U.S. ----, 114 S.Ct. 807, --- L.Ed.2d ---- (1994), (plurality opinion), reiterating this proposition. Justice Scalia further explained the Court's reticence to lay the imprimatur of a substantive due process right on a claim not textually tied to "liberty" in the fourteenth amendment:

> It is an established part of our constitutional jurisprudence that the term "liberty" in the Due Process Clause extends beyond freedom from physical restraint. *See, e.g., Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Without that core textual meaning as a limitation, defining the scope of the Due Process Clause "has at times been a treacherous field for this Court," giving "reason for concern lest the only limits to ... judicial intervention become the predilections of those who happen at the time to be Members of this Court." *Moore v. East Cleveland,* 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977).

*Michael H. v. Gerald D.,* 491 U.S. 110, 121, 109 S.Ct. 2333, 2341, 105 L.Ed.2d 91 (1989) (opinion for four Justices).

The Supreme Court has been true to its word. Apart from developing the amorphous "right of privacy" that underlies the abortion cases, the Court has authored *no* decision expanding substantive due process rights for many years.[6] Moreover, in analyzing claims of rights that, while

---

[6]Apart from abortion-related cases, the Court has not upheld a new substantive due process claim since 1977. *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

> As one prominent treatise states, "The list of rights which the Court has found to be fundamental, and, therefore, worthy of strict judicial scrutiny, is not a long one." Ronald D. Rotunda and John E. Nowak, 2 Treatise of Constitutional Law § 15.7, at 434 (2d Ed.1992). The "fundamental rights" these scholars list are freedom of association; right to vote; right to interstate travel; right to fair criminal process; procedural due process; right to privacy involving marital decisions; child bearing and child rearing. *Id.* The Court has also elaborated upon the scope of constitutional protection available to those whose physical "liberty" has been restrained by the state. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). Such decisions relate to "liberty" in the traditional sense, *i.e.,* as freedom from physical restraint.

> In all of the following cases, by contrast, the Court has rejected novel fundamental rights claims: *Albright v. Oliver, supra,* (rejecting substantive due process claim for malicious prosecution); *Reno v. Flores,* --- U.S. ----, ----, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993) (alien juveniles have no "fundamental" right to be placed with private custodian rather than government institution); *Collins v. Harker Heights,* --- U.S. at ----, 112 S.Ct. at 1069 (governmental employer's duty to provide safe working environment for employees is not substantive component of due process); *Michael H. v. Gerald D.,* 491

unenumerated in the specific guarantees of the Constitution or Bill of Rights, are proffered as "fundamental," the Court has insisted on a precise definition of the right as a matter of judicial self-discipline. *Reno v. Flores,* --- U.S. ----, ----, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993); *Collins v. City of Harker Heights,* --- U.S. at ----, 112 S.Ct. at 1068. The majority and concurring opinions make no attempt to fulfill this rigorous standard. The co re of "liberty" is freedom from bodily restraint. *Foucha v. Louisiana,* --- U.S. ----, ----, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992). Doe's "right" not to be seduced by her teacher does not obviously fall within the fourteenth amendment's assurance that a person's "liberty" will not be taken without due process of law. Rampant throughout the majority and concurring opinions are various descriptions of what happened to Doe that shed little light on the precise sco pe of the "liberty interest" that will henceforth be enforceable under § 1983 by her and other public school students.

The majority apparently believe that Doe's substantive due process right to "bodily integrity" is self-evidently "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Michael H. v. Gerald D.,* 491 U.S. at 122, 109 S.Ct. at 2341, *quoting Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (Cardozo, J.). But that argument states a conclusion rather than a reason for inventing a new constitutional doctrine.[7] It is *not* obvious why this "right" should be more "fundamental" than Doe's right to her reputation or her

U.S. at 126, 109 S.Ct. at 2343 (no fundamental right of putative natural father to obtain parental prerogatives where child born into extant marital family) (plurality opinion); *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 201, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989) (state has no substantive due process duty to protect a child from father's violence where state had once taken child into temporary custody); *Baker v. McCollan,* 443 U.S. 137, 144, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979) (no deprivation of due process where brother mistakenly detained for three days pursuant to search warrant conforming to Fourth Amendment requirements); *Paul v. Davis,* 424 U.S. at 713-14, 96 S.Ct. at 1166 (claim that state may not publicize record of an arrest is far afield from "right of privacy" cases under substantive due process).

[7]Heavy irony inheres in the majority's premising Doe's bodily integrity right on the Supreme Court's abortion cases. The "right of privacy" stated in those cases has been used to *attack* statutory rape statutes, and three justices would have granted certiorari to rule on that issue. *See Michael M. v. Superior Court,* 450 U.S. 464, 491 n. 5, 101 S.Ct. 1200, 1215 n. 5, 67 L.Ed.2d 437 (Brennan, J., with Justices White and Marshall, dissenting); *see also* concurring opinion of Justice Blackmun, *Id.* at 483, 101 S.Ct. 1211. *See, e.g., State v. Jones,* 619 So.2d 418 (Fla.App.1993) (certifying constitutionality of Florida statutory rape law to State Supreme Court).

right not to be negligently run over by a state employee, neither of which enjoys constitutional protection. *See Paul v. Davis, supra.* Furthermore, Doe's right has been protected in state criminal and tort law and by federal statute.[8] The attention this "right" has received throughout state and federal statutory and common law demonstrates a history of ordered deliberation and strongly suggests that Doe's right is not "fundamental" in the sense that Doe needs the additional armature of constitutional common law to protect her.[9]

Advancing new and expanded theories of "fundamental rights" is always a heady business, gratifying because the judge believes he has served "justice" in the broadest sense. But history has shown that the "Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution." *Moore v. East Cleveland,* 431 U.S. 494, 544, 97 S.Ct. 1932, 1958, 52 L.Ed.2d 531 (1977) (White, J., dissenting). Concretely, the Supreme Court has cautioned against expanding the scope of "liberty" embodied in substantive due process and has advised that the Due Process clause should not be used to constitutionalize ordinary torts. In their zeal to "do justice," my colleagues of the majority have thrown caution to the winds and, quite unnecessarily, have awarded Doe novel constitutional protection that supplements a variety of legal remedies already available to her. If Doe has a viable constitutional claim, I say, let the Supreme Court say so.[10]

---

[8]Although all of the states maintain criminal laws against statutory rape, not all of them set the age of consent at the age of fifteen. *See* Judge Garwood's dissent. In some of the states, the age of consent is lower. This poses an interesting question: has the majority made a constitutional offense of conduct that in some states is not criminal?

[9]In his concurrence, Judge Higginbotham suggests that my conclusion here that Doe has no constitutional right is based in part on the availability of other state and federal remedies. *See* Higginbotham Concurrence at 5. However, that suggestion seriously mischaracterizes my argument. My point is that the majority's ill-founded finding of a "fundamental" right is especially unnecessary where the constitutional remedy is merely redundant of well-established criminal, tort, and statutory sanctions, not that the presence of the latter dictate the absence of the former.

[10]None of this discussion suggests that the Supreme Court would not ultimately recognize a constitutional "fundamental right" of a young student not to be sexually molested by a teacher in the classroom or on school grounds, or of an older student not to be confronted with a teacher's sexual demands as a *quid pro quo* for receiving good grades. But to comport with the Supreme Court's own above-cited pronouncements, the reason such a "right" is "fundamental" should be

I respectfully dissent.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

I concur in the judgment of the Court to the extent that it holds "[s]ummary judgment should have been granted to defendant Caplinger on the grounds of qualified immunity." However, I respectfully dissent from the Court's judgment that "Jane Doe has, in a manner sufficient to withstand a motion for summary judgment, stated a claim under § 1983 that defendant Lankford was deliberately indifferent to his subordinate's violation of her constitutional right to bodily integrity"—essentially for the reasons so forcefully articulated by Judges Garwood and Jones in their dissenting opinions, in which I join.[1]

I write separately, however, to comment on an issue fundamental to § 1983 that the majority opinion essentially ignores and the concurring opinion only briefly addresses: the lack of state action.[2]

I

The concurring opinion correctly focuses on "the circle of liability under 42 U.S.C. § 1983." Concurring op. slip op. at 2878. "We have interpreted section 1983 to require a court to determine whether a rights violation occurred, whether it occurred under the color of state law, and whether the particular state actor or actors before the court caused the violation." *Id.* (citing *Bush v. Viterna,* 795 F.2d 1203, 1209 (5th Cir.1986)). Under the second prong of the *Bush* test, the concurrence concludes that, based on Stroud's position as a teacher, "the deprivation of liberty[—whether such

---

clearly articulated; the parameters of the "right" should be carefully and cautiously defined; and the "right" should accomplish a public purpose beyond simply constitutionalizing tortious conduct. The majority and concurring opinions have done none of these things.

[1] These dissenting opinions address the two prong analytical structure for claims of qualified immunity recently established by the Supreme Court. *See Siegert v. Gilley,* 500 U.S. 226, ----, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1992) ("A necessary concomitant to determination of whether the constitutional right asserted by a plaintiff is "clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.") ("We think the Court of Appeals should not have assumed without deciding this preliminary issue in the case.") Judge Jones has presented her arguments on the first prong of the *Siegert* analysis—"has [the plaintiff] asserted a violation of a constitutional right at all[?]" Judge Garwood has addressed the second prong—"whether the constitutional right asserted by [the] plaintiff is "clearly established' at the time of the defendant[s] acted[?]"

[2] *See infra* note 5.

deprivation occurred on or off school grounds—]occurred under the color of state law":

> [T]he approval which Stroud conferred on Doe is both one of the most common and one of the most effective tools used by teachers in affecting the behavior of their students. *It is precisely this use by Stroud of his position of authority to which I point. The very official nature of this attention* facilitated his efforts—and indeed enabled him—to violate her rights.

*Id.* slip op. at 2881-82 (emphasis added).

> Stroud's official interactions with Doe and his sexual involvement with her together constituted an indivisible, ongoing relationship. The special attention Stroud gave Doe *as her teacher* afforded him the opportunity to exert his influence. He levered his authority to press upon Doe his sexual desires, while both on and off school grounds. He treated Doe differently than he treated other members of his class. He gave her good grades, required of her less work than other students, and allowed her to behave as she liked in his classroom. *This manipulative course of conduct was an abuse of power conferred by the state.* I am persuaded that Stroud acted under color of state law.

*Id.* slip op. at 2881 (emphasis added). With less analysis, the majority opinion concludes that Stroud acted under color of state law because a "real nexus exists between the activity out of which the violation occur[red] and the teacher's duties and obligations as a teacher."[3] Maj. op. slip op. at 2869 n. 4. Determining whether such a "nexus" supports a finding of state action for the purposes of § 1983, sufficient to withstand a motion for summary judgment, requires a review of case authority on the following issue—what grant of authority under state law to a state official is required to support a finding of state action.

## II

### A

"Section 1983 provides a remedy against "any person' who, *under color of state law,* deprives another of rights protected by the Constitution."[4] *Collins v. City of Harker Heights,* --- U.S. ----, ----, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992) (emphasis added). Thus, in any cause of action

---

[3]*See also infra* note 21.

[4]Section 1983 states, in relevant part: "Every person who, *under color of any statute, ordinance, or regulation, custom, or usage, of any state* ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983 (emphasis added). Significantly, neither the word "position" nor "office" is used in the statute. *Cf. Mesa v. California,* 489 U.S. 121, 135, 109 S.Ct. 959, 968, 103 L.Ed.2d 99 (1989) (defining "under color of office" to mean "in the performance of [the official's] duties").

brought under § 1983, a fundamental "question that must be asked is whether the alleged deprivation of a federal right has been accomplished by state action." *Bush v. Viterna,* 795 F.2d 1203, 1209 (5th Cir.1986) (citation omitted). To answer this question, "it will obviously be necessary to consult state law in order to decide whether the deprivation occurred "under color of any statute, ordinance, regulation, custom, or usage' of the state." *Id.*

1

The Supreme Court has established two lines of cases that must be consulted when determining whether state action exists. The first line of cases, represented by *Barney v. City of New York,* 193 U.S. 430, 437, 24 S.Ct. 502, 503, 48 L.Ed. 737 (1904), holds that state action does not exist when the act complained of "was not only not authorized, but was forbidden by [state] legislation."[5]

In *Barney,* the plaintiff sought to enjoin the construction of a subway tunnel adjacent to his property, contending that it would deprive him of his property in violation of the Due Process Clause because the tunnel was being built closer to his property than was authorized by the relevant resolutions. The lower court dismissed the bill for want of jurisdiction. The Supreme Court affirmed, finding that no state action occurred because "the construction of the ... tunnel section was not only not authorized, but was forbidden by the legislation, and hence was not action by the State of New York within the intent and meaning of the 14th Amendment." *Id.* at 437, 24 S.Ct. at 503; *see also id.* at 441, 24 S.Ct. at 505 ("In the present case defendants were proceeding, not only in violation of provisions of state law, but in opposition to plain provisions."). Consequently, the plaintiff did not state a federal cause of action because "it is for the state courts to remedy acts of state officers done without the authority of, or contrary to, state law." *Id.* at 438, 24 S.Ct. at 503; *see id.* at 439, 24 S.Ct. at 504 (" "The wrongful act of an individual, unsupported by any [state] authority, is simply a

---

[5]Technically, *Barney* and the other Fourteenth Amendment cases referred to *infra* involve the question whether the actions of a state official constituted "state action" for the purpose of the Fourteenth Amendment. However, these cases are relevant to the under-color-of-state-law inquiry because "in a § 1983 action brought against a state official, the statutory requirement of action "under color of state law' and the "state action' requirement of the Fourteenth Amendment are identical." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982).

private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, ... but if not sanctioned in some way by the state, or not done under state authority, his rights remain full in force and may presumably be vindicated by resort to the laws of the state for redress.' ") (quoting *The Civil Rights Cases,* 109 U.S. 3, 16-17, 3 S.Ct. 18, 25-26, 27 L.Ed. 835 (1883)).[6]

In *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), the plaintiff contended that the defendants, members of the Illinois State Primary Canvassing Board, violated his Fourteenth Amendment rights when they failed and subsequently refused to file with the Secretary of State a certificate listing the plaintiff as a candidate for a seat in the state assembly. Justice Frankfurter stated that the Board's dereliction of its duty did not constitute state action because the Board violated state law by not filing a correct certificate:

> I am unable to grasp the principle on which the State can here be said to deny the plaintiff the equal protection of the laws of the State when the foundation of his claim is that the Board had disobeyed the authentic command of the State....
>
> I am clear, therefore, that the action of the Canvassing Board taken, as the plaintiff himself acknowledges, in defiance of the duty of that Board under Illinois law, cannot be

---

[6]See also *Lugar,* 457 U.S. 933, 102 S.Ct. 2744, where a debtor brought a § 1983 claim against his corporate creditor and its president, alleging that they deprived him of his property without due process by obtaining a prejudgment attachment of the property pursuant to a Virginia statute. The Court agreed with the defendants' contention that no state action occurred. "As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that most rights secured by the Constitution are protected only against infringement by governments." *Id.* at 936, 102 S.Ct. at 2753 (citation omitted).

> "In 1883, this Court in the *Civil Rights Cases,* 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835], affirmed the essential dichotomy set forth in [the Fourteenth] Amendment between deprivation by the State, subject to scrutiny under its provisions, and private conduct, "however discriminatory or wrongful,' against which the Fourteenth Amendment offers no shield."

*Id.* (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)). Accordingly, "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State" for a § 1983 cause of action to lie. *Id.* at 937, 102 S.Ct. at 2753. The Court held that the plaintiff had not stated a cause of action under § 1983 for misuse of the state statutory scheme because "the conduct of which [plaintiff] complained could not be ascribed to any governmental decision; rather, [defendants] were acting *contrary to the relevant policy articulated by the State.* Nor did they have the authority of state officials to put the weight of the State behind their private decision...." *Id.* at 940, 102 S.Ct. at 2755 (emphasis added).

deemed the action of the State....[7]

*Id.* at 17, 64 S.Ct. at 405 (Frankfurter, J., concurring) (citing *Barney* ).

2

The second line of Supreme Court cases holds that state action is established if the state official "ha[s] jurisdiction to [act] under the laws of the state," *Raymond v. Chicago Union Traction Co.,* 207 U.S. 20, 37, 28 S.Ct. 7, 13, 52 L.Ed. 78 (1907), and "misuses the power possessed to do a wrong forbidden by the [Constitution]." *Home Telephone & Telegraph Co. v. City of Los Angeles,* 227 U.S. 278, 287, 33 S.Ct. 312, 315, 57 L.Ed. 510 (1913).

In *Raymond,* the plaintiff company alleged that the Illinois state board of equalization—a body "provided by the state for the purpose of raising the public revenue by way of taxation" of corporations—violated the Fourteenth Amendment by making certain assessments upon it. The Supreme Court found that the board's ratification of the challenged assessment constituted state action because "the board was making an assessment which it had jurisdiction to make under the laws of the state." 207 U.S. at 37, 28 S.Ct. at 13. Because the state had specifically granted to the board the power to make the assessments that the plaintiff had challenged, the Court determined that *Barney,* which held that "where the act complained of was forbidden by the state legislature, it could not be said to be the act of the State," *id.,* did not control.[8]

Similarly, the plaintiff in *Home Telephone* alleged that the city of Los Angeles, by adopting an ordinance setting rates for telephone services at confiscatory levels, violated the Fourteenth Amendment, as well as the state constitution. The city contended that "the [Fourteenth] Amendment

---

[7]The majority, apparently disagreeing with Justice Frankfurter's analysis, found that the right alleged by the plaintiff to have been violated simply was "one secured to him by state statute and the deprivation of right [was] alleged to result solely from the Board's failure to obey state law." *Id.* 321 U.S. at 7, 64 S.Ct. at 400. Because the plaintiff did not contend "that the statutes of the state [were] in any respect inconsistent with the guarantees of the Fourteenth Amendment," *id.,* the Court held that he had failed to allege a federal cause of action. *Id.* at 11, 64 S.Ct. at 402 ("Mere violation of a state statute does not infringe the federal Constitution.").

[8]Justice Holmes—"unable to grasp the principle on which a state is said to deprive the [plaintiff] of its property without due process because a subordinate board, subject to the control of the supreme court of the state, is said to have violated the express requirement of the state in its Constitution"—disagreed. *Id.* 207 U.S. at 39, 28 S.Ct. at 14 (Holmes, J., dissenting).

deals only with acts of state officers within the strict scope of the public powers possessed by them, and does not include an abuse of power by an officer as the result of a wrong done in excess of the power delegated." 227 U.S. at 286, 33 S.Ct. at 315. The Supreme Court disagreed, holding that state action occurs "where an officer or other representative of a state, in the exercise of the authority with which he is clothed, misuses the power possessed to do a wrong forbidden by the [Fourteenth] Amendment." *Id.* Where the state grants an official the authority to act and the official acts pursuant to that authority but exceeds the limits of the grant, "inquiry into whether the state has *authorized* the wrong is irrelevant." *Id.* (emphasis added). Accordingly, the city's conduct constituted state action because "acts done under the authority of a municipal ordinance passed in virtue of power conferred by a state are embraced by the 14th Amendment." *Id.* at 292, 33 S.Ct. at 317; *see also id.* at 286, 33 S.Ct. at 315 ("the settled construction of the Amendment is that it presupposes the possibility of an abuse by a state officer ... *of the powers possessed,* and deals with such a contingency") (emphasis added).

3

The Supreme Court first applied the lessons of the Fourteenth Amendment inquiries to the "under color of law" issue in three criminal cases: *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); and *United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

In *Classic,* the government charged that the defendants, Louisiana election officials, altered and falsely counted ballots cast in a primary election, in violation of the federal criminal civil rights counterpart to § 1983. *See* 18 U.S.C. § 242. Relying on *Home Telephone's* definition of state action, the Court held that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of' state law."[9] *Id.* 313 U.S. at 326, 61 S.Ct. at 1043. Consequently, the officials acted under color of state

_____

[9]This statement is "founded on the rule announced in *Ex Parte Virginia,* 100 U.S. 339, 346-47, 25 L.Ed. 676 (1880), that the actions of a state officer *who exceeds the limit of his authority* constitute state action for purposes of the Fourteenth Amendment." *Lugar,* 457 U.S. at 929, 102 S.Ct. at 2750 (emphasis added).

law when altering and falsely counting the ballots because their acts "were committed in the course of their performance of duties under the Louisiana statute requi ring them to count the ballots, to record the result of the count, and to certify the result of the election." *Id.* at 325-26, 61 S.Ct. at 1042-43.

The government in *Screws* charged that the defendants—a Georgia sheriff, policeman, and special deputy—arrested and then beat to death Robert Hall, a young African-American, in violation of the federal criminal civil rights counterpart to § 1983. Citing *Classic* for the principle that misuse of authority possessed by virtue of state law constitutes action taken under color of state law, the Court held that the defendants acted under color of state law in assaulting Hall because "they were officers of the law who made the arrest [and, b]y their own admissions they assaulted Hall in order to protect themselves and to keep their prisoner from escaping. It was their duty under Georgia law to make the arrest effective." *Id.* at 107-08, 65 S.Ct. at 1038.

*Raines* involved government allegations that a Georgia county Board of Registrars had racially discriminated against African-Americans who sought to register to vote, in violation of 42 U.S.C. § 1971. The court held that "the conduct charged—discrimination by state officials, within the course of their official duties, against the voting rights of United States citizens, on grounds of race or color—[was] certainly ... "state action.' " *Id.* at 25, 80 S.Ct. at 525. The Court also rejected the defendants' argument that their conduct did not constitute state acti on because the "higher echelons of authority in the State" had not yet approved it: "every state official, high and low, is bound by the Fourteenth and Fifteenth Amendments."[10] *Id.* Clearly, by 1960 a state official could not argue that he did not act under color of state law because his conduct violated state law if, at the

---

[10]The Court in *Raines* also stated that where the state official's conduct constitutes state action, "it makes no difference that the discrimination in question ... is also violative of state law." 362 U.S. at 25, 80 S.Ct. at 525 (citing *Snowden,* 321 U.S. at 11, 64 S.Ct. at 403). The import of this statement is unclear, as the Court appeared to be responding to the defendants' argument that state action does not exist until a lower official's conduct has been approved by a higher official—i.e., if the higher official reverses the lower official's decision, the lower official's decision then contravenes state law and does not constitute state action. Whatever the merits of this type of after-the-fact declaration, it is not relevant here because state criminal law unquestionably prohibited Stroud's conduct.

time of acting, he possessed a general grant of authority from the state and misused it.[11]

The Supreme Court first addressed § 1983's "under color of law" requirement in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled in part on other grounds, Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Monroes sued the city of Chicago, among others, under § 1983, alleging that thirteen Chicago police officers broke into their home without a warrant, routed them from bed, made them stand naked while the officers ransacked their home, and then took James Monroe to the police station where he was interrogated for ten hours. The city argued that because the officers' conduct violated both the Illinois constitution and state laws prohibiting unreasonable searches and seizures, § 1983's requirement that the challenged acts be taken under color of state law had not been met. 365 U.S. at 172, 81 S.Ct. at 476. The Court rejected this argument, holding that the phrase "under color of state law" includes deprivations of constitutional rights effected by state officials acting in violation of state law.[12] *Id.* at 183, 81 S.Ct. at 482. The Court then held that the police officers acted under color of state law by abusing the authority granted to them by the state to effect searches and seizures.[13]

---

[11]When a state gives an official a "general grant of authority," the state empowers the official to act in the name of the state in certain diverse factual settings. Inherent in such a grant, then, is the discretion given to the official to determine exactly when and how to act. For example, by authorizing police officers to effect searches and seizures, the state gives the officers discretion to decide when and where to search. The state then attempts to control the officers' exercise of discretion by outlawing unreasonable searches and seizures. However, because the grant of authority necessarily entails that the officers exercise discretion, and because it is inevitable that police officers on occasion will mistakenly exercise their discretion to make an unreasonable search or seizure, the grant of authority implicitly recognizes that the officers can use it to violate state law. Thus, the officers, in effecting an unreasonable search, act under color of state law despite the fact that the state has outlawed the officers' actions.

[12]In so holding, the *Monroe* court relied upon *Classic's* construction of "under color of law" in the criminal context. *Classic,* in turn, relied upon *Home Telephone's* construction of "state action" in the Fourteenth Amendment context. Justice Frankfurter, although he joined in the opinion in *Classic,* dissented in *Monroe,* arguing that "police intrusion in violation of state law is not a wrong remediable under [§ 1983]." 365 U.S. at 242, 81 S.Ct. at 513.

[13]The Supreme Court initially defined the question presented in *Monroe* as "whether Congress, in enacting § [1983], meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by *an official's abuse of his position.*" 365 U.S. at 172, 81 S.Ct. at 476 (emphasis added). However, the Court apparently considered this phrasing of the issue merely to be a restatement of *Classic's* holding that "action taken under color of law" includes " "[m]isuse

B

Although it has been stated that *Barney* has been " "so restricted by ... later decisions' " that it "must be regarded as having "been worn away by the erosion of time' ... and of contrary authority,"[14] *Raines,* 362 U.S. at 26, 80 S.Ct. at 525 (citations omitted), *Barney,* like Doe's claim, can be distinguished from the later cases on one ground particularly relevant to today's decision: *Barney* involved a state official acting in the complete absence of authority,[15] while all the later cases involved state officials acting pursuant to, but exceeding, a general grant of authority from the state. *See Raymond,* 207 U.S. at 37, 28 S.Ct. at 13 ("the board was making an assessment which it had jurisdiction to make under the laws of the state"); *Home Telephone,* 227 U.S. at 294, 33 S.Ct. at 317 (the challenged "acts [were] done under the authority of a municipal ordinance passed in virtue of power conferred by a state"); *Classic,* 313 U.S. at 325-26, 61 S.Ct. at 1042-43 (challenged acts "were committed in the course of [the officials'] performance of duties under the Louisiana statute"); *Screws,* 325 U.S. at 107-08, 65 S.Ct. at 1038 (officials were fulfilling "their duty under Georgia law"); *Raines,* 362 U.S. at 25, 80 S.Ct. at 525 ("discrimination by state officials, within the course of their official duties"); *Monroe,* 365 U.S. at 183, 81 S.Ct. at 482 (police officers abusing the authority granted to them by the state to effect reasonable searches and seizures).

---

of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Id.* 365 U.S. at 184, 81 S.Ct. at 482 (quoting *Classic,* 313 U.S. at 326, 61 S.Ct. at 1043); *see id.* at 186, 81 S.Ct. at 484 ("conclud[ing] that the meaning given "under color of' law in the Classic case and in the Screws ... case[ ] was the correct one"); *see also Lugar,* 457 U.S. at 940, 102 S.Ct. at 2755 (stating that *Monroe* adopted "the abuse of authority doctrine" in § 1983 cases).

[14]Justice Frankfurter, on the other hand, found "[n]either the wisdom of [*Barney's* ] reasoning nor its holding ... impaired by subsequent decisions." *Snowden,* 321 U.S. at 17, 64 S.Ct. at 405 (Frankfurter, J., concurring); *see also Screws,* 325 U.S. at 147-48, 65 S.Ct. at 1057 (dissenting opinion) ("It has never been satisfactorily explained how a State can be said to deprive a person of liberty or property without due process of law when the foundation of the claim is that a minor official has disobeyed the authentic command of his State.... [*Barney* ], which ruled otherwise, although questioned, has never been overruled.").

[15]*See Barney,* 193 U.S. at 437, 24 S.Ct. at 503 (noting that the defendants' act "was not only not authorized, but was forbidden by [state legislation]"); *Lugar,* 457 U.S. at 940, 102 S.Ct. at 2753 (finding that no state action occurred because the defendants "were acting contrary to the relevant policy articulated by the State ... [and did not] have the authority of state officials to put the weight of the State behind their private decision").

Accordingly, *Barney* appears to be at odds with *Home Telephone* and its progeny only if one fails to examine the relevant grant of authority to the state actor under state law in each case. For example, as *Monroe* held, acts taken pursuant to—but exceeding—a general grant of authority will give rise to a § 1983 claim when such acts deprive a person of a constitutionally protected right. Thus, the police officers in *Monroe,* while unquestionably violating state law, acted under color of state law because they acted pursuant to a general grant of authority. In other words, the police officers exercised the legitimate authority granted by the state to conduct searches of homes and arrest persons suspected of criminal activity. However, the officers exceeded the limits of that authority by effecting an unreasonable search and seizure. Consequently, the Monroes could sue under § 1983 because the officers misused or abused the otherwise legitimate authority granted to them by state law.[16] *Cf. Screws,* 325 U.S. at 110, 65 S.Ct. at 1039 (noting that in both *Classic* and *Screws,* the "officers of the State were performing their official duties; in each the power which they were authorized to exercise was misused.").[17]

However, not all unlawful actions taken by state officials are taken under color of law. *See Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1945) ("It is clear that under "color' of law means under "pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."); *see also Baker v.*

---

[16]In each of this Circuit's cases, cited in either the majority or concurring opinion, the state actor—whether it be a police officer or a school teacher—was generally authorized by the State to use force in certain situations. In none of these cases, however, did the state actor violate state law simply by using force or administering corporal punishment. Instead, it was only when the state actor exceeded his or her authority under state law that a constitutional violation occurred. *Shillingford v. Holmes,* 634 F.2d 263 (5th Cir.1981) (riot control during Mardi Gras); *Jefferson v. Yselta Independent School Dist.,* 817 F.2d 303 (5th Cir.1987) (classroom discipline); *Fee v. Herndon,* 900 F.2d 804 (5th Cir.) (same), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990). Accordingly, the challenged actions were taken under color of state law because they were taken pursuant to a general grant of authority.

[17]Similarly, *Home Telephone* did not squarely address the issue whether actions that were both taken in violation of state law and inconsistent with the actor's grant of authority constitute state action. In that case, state law gave the city authority to enact ordinances setting telephone rates. Thus, when the city set the unlawful rates, it misused the authority granted to it but did not act without authority. Accordingly, the city's acts constituted state action even though they also violated state law. 227 U.S. at 292, 33 S.Ct. at 317.

*McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2696, 61 L.Ed.2d 433 (1979) (noting that even intentional torts do not become constitutional violations merely because the tortfeasors are state officials). In *Barney,* the board did not have the power to allow the construction of the railroad tunnel in a place different from that authorized by the relevant resolutions because the board had no general authority to depart from the resolutions.[18] Consequently, by approving a different construction site, the state officials did not exceed the limits of their authority, as in *Monroe,* but rather acted in the complete absence of authority. As a result, the board's departure from the approved plans constituted a breach of state law and could not constitute action taken under color of state law. Thus, the Court found that the Due Process Clause of the Fourteenth Amendment was not violated by the board's illegal acts.[19]

## III

"Jane Doe brought this § 1983 civil rights lawsuit against Stroud, the school district, Superintendent Caplinger, and Principal Lankford[,] ... charg[ing] *inter alia* that these defendants, while acting under color of state law, deprived her of her constitutional rights guaranteed by the Fourteenth Amendment's Due Process and Equal Protection Clauses, in violation of 42 U.S.C. §

---

[18]The board was "empowered to prescribe the routes and general plan of any proposed rapid transit railroad within the city." *Barney,* 193 U.S. at 437, 24 S.Ct. at 503. However, the "[c]onsents of the municipal authorities and the abutting property owners to construction on the routes and plans adopted must be obtained, and any change in the detailed plans and specifications must accord with the general plan of construction, and, if not, like consents must be obtained to such change." *Id.* Because the board had previously prescribed the routes and general plan of the tunnel by two resolutions, "which received the assent of the local authorities and of the appellate division of the supreme court in lieu of the consent of the abutting property owners," *id.* at 431, 193 S.Ct. at 502, the board was required to obtain the consent of the local authorities and abutting property owners before making any changes to the plan of construction.

[19]This reading of *Barney* is supported by the Supreme Court's pronouncements on the liability of municipalities under § 1983 for acts taken by government officials. "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037. Instead, it is only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983." *Id.,* 436 U.S. at 694, 98 S.Ct. at 2037-38; *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 486, 106 S.Ct. 1292, 1301, 89 L.Ed.2d 452 (1986) (White, J., concurring) ("Local law enforcement officers are expected to obey the law.... Where the controlling law places limits on their authority, they cannot be said to have the authority to make contrary policy."). Accordingly, if a state official without policy-making authority acts contrary to established policy, his conduct is not imputed to the state.

1983." Maj. op. slip op. at 2866-67. After initially finding that "the Constitution protects a schoolchild from physical sexual abuse—here, sexually fondling a 15-year old school girl and statutory rape—by a public school teacher," *id.* slip op. at 2868, the majority interprets Doe's claim against defendants Caplinger and Lankford as alleging "failures of supervisors to prevent substantive due process violations occasioned by [Stroud]" that demonstrate a "deliberate indifference to ... her constitutional rights." *Id.* slip op. at 2872-73. Accordingly, for the supervisors to be liable, Stroud must have been acting under color of state law when committing the acts that Doe alleges violated her right to due process.[20] The majority, however, gives short shrift to this initial question:[21] whether an actor, engaged in the physical sexual abuse of a student, is acting *under color of state law*.

The concurring opinion concludes that, because (1) the school district placed Stroud in a position of authority, (2) the special attention Stroud gave Doe as her teacher afforded him the opportunity to exert an influence over her, and (3) Stroud used this influence to press his sexual desires upon her, Stroud's manipulative conduct constituted an abuse of power conferred by the state. I agree that the school placed Stroud in a position of authority, that Stroud's position afforded him the opportunity to exert an influence over Doe, and that Stroud used his position in his attempts to

---

[20]If Stroud was not acting under color of state law when he engaged in intercourse with or fondled Doe, the supervisory defendants cannot be held liable under § 1983 because "nothing in the Due Process Clause requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989); *see also Maldonado v. Josey,* 975 F.2d 727, 731 (10th Cir.1992) (compulsory school attendance laws do not give rise to an affirmative constitutional duty to protect students from deprivations of constitutional rights by private actors), *cert. denied,* --- U.S. ----, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1372-73 (3d Cir.1992) (school authorities do not have an affirmative constitutional duty to protect students from sexual abuse by other students), *cert. denied,* --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *J.O. v. Alton Community Sch. Dist. 11,* 909 F.2d 267, 272-73 (7th Cir.1990) (school officials do not have an affirmative constitutional duty arising out of their "special relationship" with students to protect students from sexual assault by a teacher).

[21]*See* maj. op. slip op. at 2869 n. 4 ("As the court in *D.T.* recognized, if a "real nexus' exists between the activity out of which the violation occurs and the teacher's duty and obligations as a teacher, then the teacher's conduct is taken under color of state law. [*D.T. v. Independent Sch. Dist.,* 894 F.2d 1176, 1188 (10th Cir.), *cert. denied,* 498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990) ]. As demonstrated by the above facts, the nexus that was missing in *D.T.* was clearly present in this case. We therefore reject the school's officials' argument that Stroud's acts were not under color of state law."). This statement of the issue begs the essential question.

persuade Doe to have sex with him. However, "consult[ing] state law" as required by *Bush,* 795 F.2d at 1209, I do not believe that these facts justify finding that Stroud acted under color of state law.

Clearly, the State of Texas did not authorize, "under color of any statute, ordinance, or regulation, custom, or usage," either the sexually fondling of a 15-year old student or statutory rape. In fact, Texas has specifically proscribed such conduct.[22] To paraphrase the majority opinion, "[n]o reasonable public school official in 1987 would have assumed that he could, with [state criminal] immunity, sexually molest a minor student." Maj. op. at ----. Thus, the state, by authorizing Stroud to teach students, did not give him the authority to violate state criminal law by sexually abusing his students. Accordingly, it is only in the sense that Stroud had no grant of authority to sexually abuse Doe that one can suggest or argue that Stroud misused or abused his position as a teacher. Consequently, Stroud, bent upon violating state criminal law, did not act under color of state law when doing so.[23]

Nor is the fact that Stroud used his position as teacher to press his sexual desires upon Doe sufficient to conclude that Stroud acted under color of state law. If misuse or abuse of position was sufficient to demonstrate action occurring under color of state law, then every intentional tort committed by a state official—which is, essentially, what Stroud's conduct amounts to—would give rise to a § 1983 claim. Both the Supreme Court and this Court, however, have rejected this view. *See Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981) (noting that not every injury inflicted by a state official acting under color of state law is actionable under § 1983); *Baker,* 443 U.S. at 146, 99 S.Ct. at 2696 (noting that intentional torts do not become constitutional

---

[22]*See* Tex.Civ.Prac. and Rem.Code §§ 101.021 and .051 (1986); Tex.Educ.Code § 21.912(b) (1987); Tex. Penal Code § 22.011(a)(2) (1989); *Salinas v. Fort Worth Cab & Baggage Co.,* 725 S.W.2d 701 (Tex.1987) (suit against cab company based on its employee's rape of plaintiff). Stroud, in fact, "pled guilty to criminal charges stemming from his molestation of Jane Doe." Maj. op. slip op. at 2867.

[23]The fatal flaw in the majority's analysis can be shown with one hypothetical: assume that a teacher shoots a student for not turning in his or her homework. Following the majority's approach, there exists a "real nexus" between the activity out of which the violation—i.e., the shooting—occurred and the teacher's duties and obligations as a teacher. Thus, the teacher acted under color of state law, and the student may bring a § 1983 action. Consequently, the majority essentially raises to the level of a constitutional violation all torts committed by teachers against students.

violations merely because the tortfeasors are state officials); *Doe v. State of La.,* 2 F.3d 1412, 1421 (5th Cir.1993) (concurring opinion) (noting that while "the actions of which Doe complains are egregious", that fact alone "does not mean that he has asserted the violation of a federally protected right, as required by 42 U.S.C. § 1983"); *Fee v. Herndon,* 900 F.2d 804, 808 (5th Cir.) ("[T]he Constitution is not a criminal or civil code to be invoked invariably for the crimes or torts of state educators who act in contravention of the very laws designed to thwart [abuse by teachers]."), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990). In fact, this Court has even held that a rape perpetrated by a state official was not an act under color of state law.[24] *See City of Green Cove Springs v. Donaldson,* 348 F.2d 197 (5th Cir.1965) (holding that a police officer's rape of an "arrestee" was outside the scope of his employment); *see also Screws,* 325 U.S. at 108-09, 65 S.Ct. at 1039 ("The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the Constitution or laws of the United States."). Although Stroud unquestionably abused his position as a teacher, he did not abuse the authority granted to him by the state—the state did not grant him any authority, as a teacher

---

[24]*See also McLaren v. Imperial Casualty & Indem. Co.,* 767 F.Supp. 1364, 1370-71 (N.D.Tex.1991) (finding that a sexual assault committed by a police officer was, under Texas law, committed outside the scope of his employment), *aff'd,* 968 F.2d 17 (5th Cir.1992) (table: unpublished opinion), *cert. denied,* --- U.S. ----, 113 S.Ct. 1269, 122 L.Ed.2d 665 (1993); *Smith v. M Sys. Food Stores, Inc.,* 156 Tex. 484, 297 S.W.2d 112, 114 (1957) (holding as a matter of law that a police officer was not acting within the scope of his employment when assaulting an acquaintance of a woman he had detained); *see also Morgan v. Tice,* 862 F.2d 1495, 1499 (11th Cir.1989) (holding that a town manager did not act under color of state law when making allegedly defamatory statements about the plaintiff); *Myers v. Morris,* 810 F.2d 1437, 1467 (8th Cir.) (noting that if court-appointed guardians, therapists, and attorneys act beyond the scope of their official duties, they do not act under color of state law), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *Bonsignore v. City of New York,* 683 F.2d 635, 638-39 (2d Cir.1982) (finding that an off-duty police office did not act under color of state law when shooting his wife with his police-issued revolver because "his actions were not "committed in the performance of any actual or pretended duty,' but were performed "in the ambit of [his] personal pursuits' ") (citations omitted); *Delcambre v. Delcambre,* 635 F.2d 407 (5th Cir. Unit A Jan. 26, 1981) (finding that a police chief was not acting under color of state law when involved in an altercation with his sister-in-law while he was on duty); *Thomas v. Cannon,* 751 F.Supp. 765 (N.D.Ill.1990) ("Assuming that [the defendant] was clothed in the authority of the state when performing his duties as a [transit worker], the attempt to rape two young girls [was] not an act even remotely related to the performance of his job. Thus, [he had] not acted under color of state law....").

or otherwise, to engage in sexual relations with or sexually fondle minor students.[25] Stroud's motive was lust; his intent, perversion; his actions, immoral and criminal—none of which are remotely pedagogic, rather pedophilic.

Accordingly, this case is not similar to *Home Telephone* or *Monroe,* where a state official had authority to take certain actions but exceeded the limits of that authority.[26] Instead, this case is governed by *Barney* because Stroud had absolutely no state-sanctioned authority to engage in any type of sexual activity with Doe; Stroud, in this regard, had no authority to misuse or abuse. *Cf. Screws,* 325 U.S. at 111, 65 S.Ct. at 1040 ("We are not dealing here with a case where an officer not authorized to act nevertheless takes action."). Because the laws of the State of Texas neither authorized or condoned, but rather proscribed the very acts of which Doe alleges violated her constitutional rights, I would hold that Stroud did not act under color of state law when statutorily raping or sexually fondling Doe. Consequently, Doe does not have a § 1983 cause of action against Lankford and Caplinger based upon their "failures [as] supervisors to prevent substantive due process violations occasioned by their subordinates," and, therefore, I respectfully dissent.

---

[25]Although the state gave Stroud the authority to teach students, which implicitly gives Stroud the discretion regarding certain matters related to teaching the students, *see supra* note 11, the state did not give Stroud any authority to engage in any type of sexual relationship with students. Thus, this is not a case like *Monroe*—where the state gave police officers the discretion to effect reasonable searches and seizures and then tried to limit the officers' exercise of discretion pursuant to that authority by outlawing unreasonable searches and seizures—but one where the state gave Stroud absolutely no discretion to engage in sexual relations with or sexually fondle his students. Stroud thus had no state-sanctioned power to engage in the acts Doe now challenges.

[26]Similarly, *United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), involved state officials—and private citizens acting in conjunction with state officials—acting beyond the permissible limits of otherwise legitimate authority granted by the state. In *Price,* the defendant deputy sheriff detained three civil rights workers and then released them from state custody so that he could later intercept them and place them "in an official automobile of the ... Sheriff's office," and transport them to an area so they could be assaulted and killed. *Id.* at 790, 86 S.Ct. at 1155; *see also id.* at 795, 86 S.Ct. at 1157 ("the brutal joint adventure was made possible by state detention and calculated release of the prisoners by an officer of the State"); *id.* at 796, 86 S.Ct. at 1158 ("it was the purpose of the conspiracy that Deputy Sheriff Price would release [the victims] from custody" so that the other conspirators could kill them); *id.* at 799, 86 S.Ct. at 1159 (noting that the state officials used the state's "sovereign power and office to release the victims from jail so that they ... could be intercepted and killed"). Because the deputy sheriff exceeded the limits of the authority granted to him by the state—*i.e.,* the authority to arrest persons and release prisoners from state custody—he, along with his coconspirators, acted under color of law.